Judge MAX N. TOBIAS, JR.
liThe plaintiffs, André J. Robert, J. Sto-rey Charbonnet, Randall G. Mourot, and MarketFare, L.L.C. (referred to collectively as “the Plaintiffs”), appeal from a partial final judgment rendered on 21 April 2014,[1] dismissing Counts I and III[2] of their *925 fourth and fifth supplemental and amending petitions in the limited liability company member-derivative action, which they filed against the defendants, Marc Robert, Darlene Robert, Claiborne Fresh Market, LLC, and Robert Management Company, LLC (“RMC”) (referred to collectively as “the Defendants”), on the ground that these claims had prescribed under La. R.S. 12:1502. The Plaintiffs’ suit, in part, alleges that the Defendants intentionally breached fiduciary duties owed to the Plaintiffs by utilizing a new limited liability company to lease and open a grocery store, inter alia, the Claiborne Avenue Store, without their involvement. The Defendants filed an exception of prescription, averring that the |2PIaintiffs’ petition was filed after any claim for the alleged intentional breach of fiduciary duty had already prescribed. The trial judge determined that as of 25 August 2007, the Plaintiffs knew, or should have known, of the alleged intentional breach of fiduciary duties committed by the Defendants regarding the Claiborne Avenue Store. Accordingly, the trial court determined that as of the filing of the Plaintiffs’ petition on 28 April 2010, this cause of action had prescribed.[3] For the following reasons, we affirm.
In 1999, MarketFare, L.L.C. (“Market-Fare”), was formed by Marc Robert (“Marc”) as a manager-managed Louisiana limited liability company for purposes of acquiring, through a bankruptcy action, leases on former Schwegmann Grocery Stores in New Orleans. To raise the necessary capital, Marc recruited investors, |sincluding the Plaintiffs: his brother An-dré J. Robert (“André”), J. Storey Char-bonnet (“Storey”), and Randall G. Mourot *926 (“Randy”)-[4] The Plaintiffs collectively own 32.2% of the membership interest in Mar- ' ketFare, whereas Marc and his wife, Darlene Robert (“Darlene”), own 65% of the membership interest of the company in community.[5]
MarketFare initially submitted bids on five Schwegmann Grocery Store leases, but was the high bidder on only four of them. MarketFare created four wholly owned subsidiaries to separately own and operate each of the four stores; namely: MarketFare N. Broad,'LLC; MarketFare Canal, LLC; MarketFare St. Claude, LLC; .and, MarketFare Annunciation, LLC (collectively, “Subsidiary LLCs”).[6] RMC was designated as the manager for the newly-formed MarketFare as well as for the Subsidary LLCs. Marc and Darlene are the sole members of RMC.
Prior to successfully acquiring the four leases, Marc sought the advice of Schweg-mann Grocery Stores’ former chief financial officer, David Erath, in return |4for his earning a 5% ownership interest in Mar-ketFare.[7] According to Mr. Erath, he understood that the formation of MarketFare was solely for the purpose of acquiring the leases of the former Schwegmann Grocery Stores and “nothing more.”
The evidence contained in the record on appeal suggests, and the trial judge concluded, that from 1995 to 2005, the Mar-ketFare stores lost over a million dollars per year. In May 2004, due to a continuous loss in revenue, the Broad Street Store was closed. Following severe property damage sustained during Hurricane Katrina in August 2005, MarketFare’s operations at the remaining three grocery stores ceased and the Subsidiary LLCs were over $6 million in debt.[8] As a result of the severe damages sustained to the various properties during the hurricane and the denial of payment for its insurance claims by MarketFare’s insurers, MarketFare filed lawsuits for the collection of insurance proceeds. Despite the cessation of operations and the closure of its grocery stores, coupled with the growing sentiment among the Plaintiffs that MarketFare was a “bad investment,” the company did not fold as its assets included a rather sizeable insurance claim.
In February 2006, Marc held an investors’ meeting. Present were the investors *927 of MRE, MarketFare, and another entity formed by Marc, M.L. Robert, | JI, LLC (“MLR”).[9] The trial testimony and documentary evidence contained in the record on appeal establish that during that meeting, Marc presented to the investors the fiscal condition of each company and store and the status of the insurance claims involving each. A discussion was also held regarding which company debts would be paid off, if and when the insurance proceeds were received. Additionally on the agenda for the meeting was “future developments,” wherein the trial testimony reveals that Marc presented various grocery store opportunities that he was considering in Louisiana, including potential stores in Baton Rouge, New Orleans, and on the North Shore in St. Tammany Parish. One such opportunity that Marc presented was the potential for opening a grocery store at the corner of South Carrollton and South Claiborne Avenues (the “Claiborne Avenue Store”).[10] According to Marc, and as.understood by other persons in attendance at the meeting, he was not presenting these opportunities solely to the MarketFare investors, but to all of his investors.[11]
| fiAnother investors’ meeting was held on 30 August 2006, which the record on appeal establishes included the investors of MLR, MRE, and MarketFare.[12] While André and Storey were in attendance, Randy was not. At this meeting, Marc presented the status of the pending insurance claims for each entity and store, and what debts had been paid to whom with insurance proceeds received to date. Additionally, Marc again discussed new grocery store opportunities, including the Claiborne Avenue Store, which opportunity the Plaintiffs contend was presented and discussed solely as a potential Market-Fare store.
Two weeks later, on 13 September 2006, without notice to the Plaintiffs or other *928 investors, the Defendants formed Claiborne Fresh Market, LLC (“Claiborne LLC”), establishing RMC as its managing member, for purposes of pursuing the Claiborne Avenue Store opportunity. After Claiborne LLC was formed in September 2006, nothing was done by or with the entity for approximately one year. Though Marc testified that he continued to apprise and discuss the Claiborne Avenue Store with each of his investors, both individually and at times collectively, the Plaintiffs testified they were unaware of the lease or its recordation. Then, on 20 August 2007, Claiborne LLC finalized a ground lease for the property for the future site of the Claiborne Avenue Store.
17Puring the ensuing months, the record on appeal reflects that RMC was able to obtain financing for the Claiborne Avenue Store primarily through government-sponsored loans, i.e., the New Market Tax Credits and Gulf Opportunity Zone programs, and through cash contributions made by Marc and Darlene. The Plaintiffs aver that in an application for bond financing with a local government agency, Claiborne LLC, through RMC, represented that the Claiborne Avenue Store would be “jointly owned with the Plaintiffs.” Contrary to the contentions made by the Plaintiffs, Marc testified that he never considered or intended for the Claiborne Avenue Store to be a MarketFare store (or a MLR or MRE store), nor did he present the opportunity to his investors as such.[13] According to Marc, as with all of his prior ventures, this “new investment” was a “new company” and he “was bringing [his investors] along and making sure that they knew as much information about” the investment in the event he needed equity investors and they were interested.
The Claiborne Avenue Store opened in August 2008, one year from the execution of the ground lease. MarketFare, the Subsidiary LLCs, and the individual plaintiffs held no ownership interest in the Claiborne Avenue Store.
The Plaintiffs, on behalf of MarketFare, subsequently filed suit in April 2010 against RMC, Marc, and Darlene alleging not only derivative claims on behalf of | sMarketFare under a corporate veil piercing/alter ego theory, but also individual claims. The verified petition, as amended,[14] averred that by pursuing and developing the Claiborne Avenue Store through a new limited liability company without their involvement, thereby usurping business opportunities that belonged to Mar-ketFare, the Defendants intentionally breached their fiduciary duties of loyalty and good faith owed to the Plaintiffs. In response, the Defendants filed a peremptory exception of preemption in June 2010 relative to the Claiborne Avenue Store opportunity. The trial court granted the Defendants’ exception in November 2010, finding that the Plaintiffs failed to bring suit within three years of September 2006, the date Claiborne LLC was formed.[15]
*929 Without reaching the merits of the exception, this court reversed the trial court’s judgment on the basis that La. R.S. 12:1502 is a “prescriptive statute with per-emptive time limitations.” Robert v. Robert Mgmt. Co., 11-0406, pp. 5-6 (La.App. 4 Cir. 12/7/11), 82 So.3d 396, 400. We remanded the matter for further proceedings and with instructions that the trial court make a determination regarding which of the Plaintiffs’ claims, if any, had not prescribed under La. R.S. 12:1502. Id.
In May 2013, the Defendants filed a second peremptory exception of prescription averring that, given the allegations contained in the Plaintiffs’ original and previous supplemental and amending verified petitions stating they were aware in 2007 that Marc was not offering the Claiborne Avenue Store opportunity to |9Marketfare, the Plaintiffs’ claims for breach of fiduciary duties for seizure and theft of the Claiborne Avenue Store opportunity (Count I) and conspiracy to breach fiduciary duties (Count III) set forth in the Plaintiffs’ fourth and fifth supplemental and amending petitions had prescribed. Following a four-day hearing,[16] the trial judge rendered judgment on 21 April 2014 granting the Defendants’ exception and dismissing Counts I and III. After reviewing the voluminous exhibits, extensive trial testimony, applicable law and argument of counsel, in written reasons for judgment, the trial court concluded that as of the end of August 2007, each of the Plaintiffs knew, or should have known, that MarketFare was not going to own the
Claiborne Avenue Store. Specifically, the trial judge concluded the following regarding each plaintiffs individual knowledge as to the alleged theft of the Claiborne Avenue Store opportunity from MarketFare:
Despite Plaintiffs’ contentions [that in 2006 and 2007, when MarketFare had no money or operations, they believed that MarketFare was going to acquire, build, and finance the Claiborne Store], they admitted to learning in 2007 that Mar-ketFare would not own the Claiborne Avenue Store. André testified that on August 25, 2007, he clearly recalled Marc Robert telling him that he was not going to allow him to own a part of the Claiborne Avenue Store. André Robert further testified that he was shocked to learn this. The Court finds that on August 25, 2007, when André Robert learned that he was not going to be allowed to invest in the Claiborne Avenue Store, he knew or should have known that MarketFare would not own the Claiborne Avenue Store.
André Robert points to a January 2009 email sent by André Robert to Marc Robert, to support his contention that a week after his August 25, 2007 discovery, Marc changed his position and agreed to allow André to invest in the Claiborne Avenue Store. See Exhibit D-20. André claims that once Marc changed his Imposition, he again believed that MarketFare would own the Claiborne Avenue Store. The Court rejects this contention^[17]] First, in Ex *930 hibit D-20, André confirmed that from the fall of 2007 until January 2009, he understood that [Storey] and [Randy], two members of MarketFare, would not own the Claiborne Avenue store [sie].[18] Thus, the Court finds that André Robert knew from August 2007 until January 2009 that MarketFare would not own the Claiborne Avenue Store (even if An-dré, personally, might be able to invest in it). Second, as a matter of law, once André Robert learned on 25 August 2007 that he would not own a part of the Claiborne Avenue Store, prescription started running, and it could not be stopped by subsequent statements by Marc Robert. La. R.S. 12:1502(E) explicitly provides that the time limitations for suits against managers or members of business organizations “shall not be subject to suspension on any grounds or interruption except by timely suit filed in a court of compete [sic] jurisdiction and proper venue.” See La. R.S. 12:1502(E).
Storey Charbonnet filed numerous verified petitions with this court in' which he alleged that in 2007, Marc Robert asked him if he wanted to personally invest in the Claiborne Avenue Store. See Exhibit D-27, 28, and 30. He testified that when [Marc] asked him if he wanted to invest, he understood at that time that MarketFare was not going to own the Claiborne Avenue Store. Like André Robert, [Storey] testified that he was | ^shocked when he learned that MarketFare would not own the Claiborne Avenue Store.
Both Marc and Darlene Robert testified that in late summer of 2007, they had a conversation with [Storey] in their driveway at home. In that conversation, [Storey] confirmed that he did not want to own a part of the Claiborne Avenue Store, he understood that Marc and Darlene Robert were going to open the Claiborne Avenue Store without him, and he wished their family well with the new store. [Storey] did not deny that this 2007 conversation took place, and, in fact, admitted to telling Marc Robert in 2006 that he “probably would not want to participate any further in Market-Fare.” [Storey] also admitted to telling [Marc] in 2007 that he was “unhappy” with his MarketFare investment and would be “very happy” to sell.
In August of 2008, the same month that the Claiborne Avenue Store opened, [Storey] told his CPA in an email, that MarketFare had “no business” and all of its “stores were destroyed”. See Exhibit D-19.[19] This further proves that *931 from 2007 through August of 2008, [Sto-rey] did not believe that MarketFare was the owner of the Claiborne Avenue Store. The Court finds that by the end of August 2007, Storey Charbonnet knew or should have known that Mar-ketFare would not own the Claiborne Avenue Store.
Randy Mouret testified that André Robert was his close friend, former roommate, and trusted financial broker — who had full discretion to make investments on [Randy’s] behalf. André Robert testified that he kept [Randy] informed regarding major MarketFare events. [Randy] testified that in 2006, he was of the opinion that MarketFare should not re-open its damaged stores, and admitted to emailing [Marc] about the “better than expected ending to MarketFare.” See Exhibit D-10.
[Randy] testified that he spoke to An-dré in August of 2007. [Randy] also testified that in March of 2008, he was going to meet with Marc Robert, André Robert and [Storey] (but not with all MarketFare members) regarding the Claiborne Avenue Store. He, however, admitted that no such meeting ever took place. The Court finds that given [Randy’s] close friendship with André and the fact that he was never called to or attended a MarketFare meeting to discuss the Claiborne Avenue 112Store, Randy Mouret knew or should have known that MarketFare would not own the Claiborne Avenue Store in August of 2007, or at the latest March of 2008.
Storey Charbonnet, André Robert, and Randy Mouret are sophisticated businessmen. After Hurricane Katrina, they manifested their respective desires not to participate and/or invest further in MarketFare. The critical date surrounding the opening of the Claiborne Store is August 25, 2007. From this date, the Court finds these sophisticated businessmen knew or should have known of the opening of the Claiborne Store, and, as a result of the breach of fiduciary duties committed by [RMC]. As of the filing of the petition on April 23, 2010, this cause of action prescribed.
Citing La. R.S. 15:1502 E, the trial court further concluded that “[a]s soon as any one of the three Plaintiffs knew or should have known that MarketFare was not going to own the Claiborne Avenue Store, prescription for MarketFare’s derivative claim started to run, and prescription could not be suspended or interrupted as a matter of law, until the Plaintiffs filed suit.”
Following rendition of the trial court judgment, the instant appeal filed by the Plaintiffs ensued.[20]
DISCUSSION
The seminal issue in this case involves the determination of when prescription began to run on the Plaintiffs’ claims that the Defendants’ breached their duties of loyalty and good faith to MarketFare by allegedly seizing and converting the Claiborne Avenue Store opportunity. Put simply, at the heart of the case is what the Plaintiffs knew about the alleged diverted business opportunity and when they knew it. The trial court concluded that the alleged theft or conversion occurred, and that prescription commenced running, in August 2007, | ijjWhen the Plaintiffs each testified that they had personal knowledge that Market-Fare was not going to own the Claiborne *932 Avénue Store.[21] In contrast, the Plaintiffs contend that the “ultimate act of conversion,” however, did not occur, and that prescription did not begin to run, until one year later in August 2008, when the Defendants actually opened the Claiborne Avenue Store outside of MarketFare.[22] Alternatively, the Plaintiffs contend that, even if they knew of the alleged theft of the opportunity in August 2007, the doctrine of contra non valentum should be applied to toll the time limitations set forth in La. R.S. 12:1502 to August 2008 because this is when the Claiborne Avenue Store was opened and when Marc disclosed to them how he had obtained the financing to build and open the store.
The Plaintiffs aver the trial court committed reversible error in the following seven respects: (1) in finding that the Claiborne Avenue Store opened in August 2007; (2) in refusing to evaluate RMC’s duty of disclosure as a “paramount” consideration when imposing a duty to investigate on the Plaintiffs; (3) in finding that prescription commenced before the injurious act occurred; (4) in relying on 114comments made outside the context of a MarketFare meeting to determine when prescription commenced; (5) in finding that prescription commenced on 25 August 2007, when the evidence established that the Plaintiffs had no knowledge that Mar-ketFare had been damaged; (6) in holding that prescription was not tolled by Marc’s disavowal and concealment; and (7) in imputing the knowledge of one plaintiff to the others.

Standard of Review

At the outset, we note that evidence was submitted at the hearing on the Defendants’ exception of prescription. As such, Louisiana jurisprudence provides for the following standard of review:
If evidence is submitted at the hearing on the peremptory exception of prescription, the district court’s findings of fact are reviewed under the manifest error-clearly wrong standard of review. Stobart v. State, through DOTD, 617 So.2d 880, 882 (La.1993). If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Id., 617 So.2d at 882-83. *933 Rando v. Anco Insulations, Inc., 08-1163, p. 20 (La.5/22/09), 16 So.3d 1065, 1082. Accordingly, we will review the trial court’s findings of fact utilizing the manifest error-clearly wrong standard of review.
Extensive testimony was elicited during the four-day hearing. Where a conflict in the testimony exists, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel that its own evaluations and inferences are reasonable. Where two permissible views of the evidence are presented, the fact finder’s | 1schoice between them cannot be manifestly erroneous or clearly wrong. Great deference is owed to the trier of fact’s findings, for it is understood that only the fact finding can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Where documents or objective evidence so contradict a witness’ story, or the story is itself so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’ story, the court of appeal ’may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a fact finder’s finding is based on its decision to credit the testimony of one or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, 89-0607, pp. 3-4 (La.9/12/89), 549 So.2d 840, 844-845; McCaskill v. Rosiere, 09-0323, p. 3 (La.App. 4 Cir. 8/24/09), 20 So.3d 496, 499.
The standard of review changes when an appellate court reviews alleged legal errors committed by the trial court. When reviewing legal errors, an appellate court is required to review the record de novo. Bell v. Glaser, p. 4 (La.App. 4 Cir. 7/1/09), 16 So.3d 514, 516. A legal error occurs when a trial court applies incorrect legal principles of law and those errors are prejudicial such that they materially affect the-outcome and deprive a party of substantial rights. Id. A de novo review should be limited to consequential errors, which are those that have prejudiced or tainted the verdict rendered. Brooks v. Southern University Agr. and Mechanical College, 03-0231, p. 5 (LaApp. 4 Cir. 7/14/04), 877 So.2d 1194,1200.
La. R.S. 12:1502, which governs actions against persons who control business organizations, sets forth the prescriptive period for Count I of the |^Plaintiffs’ derivative action seeking damages for the Defendants’ alleged breach of fiduciary duties for their seizure and theft of the Claiborne Avenue Store opportunity.[23] It provides, in pertinent part:
D. No action for damages against any person ... for intentional tortious misconduct, or for an intentional breach of a duty of loyalty, or for an intentional unlawful distribution, or for acts or omissions in bad faith, or involving fraud, or a knowing and intentional violation of law, shall be brought unless it is filed in a court of competent jurisdiction and proper venue within two years from the date of the alleged act or omission, or within two years from the date the alleged act or omission is discovered or should have been discovered, but in no event shall an action covered by the provisions of this Subsection be brought more than three years from the date of the alleged act or omission.
E. The time limitations provided in this Section shall not be subject to suspension on any grounds or interruption except by timely suit filed in a court of *934 competent jurisdiction and proper venue.
In short, according to the statute, a plaintiff asserting a claim for an intentional act against a person or entity who controls a business must file suit either within (1) two years from the date of the alleged act, or (2) two years from the date the alleged act is discovered or should have been discovered. Regardless, no action can be brought by the plaintiff more than three years from the date of the alleged act or omission. La. R.S. 12:1502 D. La. R.S. 12:1502, like all prescription statutes, is strictly construed against prescription and in favor of maintaining the cause of action. Wimberly v. Gatch, 93-2361 (La.4/11/94), 635 So.2d 206, 211.
Ordinarily, prescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she has |17been the victim of an injury. Dominion Exploration & Production, Inc. v. Waters, 07-0386, p. 8 (La.App. 4 Cir. 11/14/07), 972 So.2d 350, 357. Clearly, prescription begins to run when a plaintiff has actual' knowledge that a damaging act has occurred. However, in the absence of a plaintiffs actual knowledge, prescription will commence running when the plaintiff has constructive knowledge; that is, information sufficient to incite curiosity, excite attention, or put a reasonable person on guard to call for inquiry. Id. Ultimately, when prescription commences to run depends on the reasonableness of a plaintiffs action or inaction in light of his education, intelligence, and the nature of the defendant’s conduct. Id.
Unlike liberative prescription for delic-tual actions under La. C.C. art. 3492, which is triggered from the day “injury or damage is sustained,” according to the express wording of La. R.S. 12:1502, prescription for actions brought pursuant to this article commences from the date of the “alleged act or omission,” or from the date the plaintiff discovered or should have discovered the “alleged act or omission,” and not from the date the damage is sustained. La. R.S. 12:1502 D.
The party raising the exception generally bears the burden of proving that the claim has prescribed. However, if prescription is evident on the face of the pleadings, the burden shifts to the opposing party to show that the action has not prescribed. Campo v. Correa, 01-2707, p. 7 (La.6/21/02), 828 So.2d 502, 508. Because of the sometimes harsh consequences which result from the strict interpretation of prescription statutes, Louisiana courts have ado pted a jurisprudential exception to prescription, which applies in some cases: contra non valentum non currit praescriptio (contra non valentum). Bergeron v. Pan American Assur. Co., 98-2421, p. 9 (La.App. 4 Cir. 4/7/99), 731 So.2d 1037, 1042. Simply put, the doctrine of contra non va-lentum prevents the running of | ^prescription where the cause of action is not known or reasonably discernable by the plaintiff. Brumfield v. Avondale Industries, Inc., 95-2260, p. 5 (La.App. 4 Cir. 5/8/96), 674 So.2d 1159, 1161-1162. The doctrine is based on the premise that, in some circumstances, equity and justice require that prescription “be suspended because the plaintiff was effectually prevented from enforcing his rights for reasons external to his own will.” Wimberly, 635 So.2d at 211. Nonetheless, while contra non valentum is applied by the courts in some cases to suspend commencement of prescription, the express wording of La. R.S. 12:1502 E specifically prohibits the application of the judicially-created doctrine under the facts and circumstances presented in this case. The statute expressly delineates *935 that the time limitations set forth therein “shall not be subject to suspension on any grounds or interruption except by timely filed suit_” [Emphasis supplied.] Suhren v. Gihert, 10-0767, p. 10 (La.App. 4 Cir. 1/12/11), 55 So.3d 941, 947.
Applying these legal precepts to the facts and circumstances presented by the instant case, and considering the pivotal issues of when the alleged act set forth in Plaintiffs’ Count I — the seizure and theft of the Claiborne Avenue Store opportunity — occurred and when the Plaintiffs knew or should have known of the alleged seizure and theft, we now turn to the Plaintiffs’ assignments of errors.
In their first assignment of error, the Plaintiffs contend that the trial court committed reversible error when it found that the Claiborne Avenue Store opened in August 2007, when the store actually opened one year later in August 2008. A review of the trial court’s reasons for judgment in their entirety reveals that the trial court, in fact, did not find that the Claiborne Avenue Store opened in August 2007 as the Plaintiffs suggest. While the trial court did state that “[t]he critical date surrounding the opening of the Claiborne Avenue [SJtore is August 25, 2007,” |1sby reviewing this in context with the remainder of its written reasons, it is clear that the court was referring to 25 August 2007 as the date André claims to have learned from Marc that he, Storey, Randy, and MarketFare were not going to own any interest in the Claiborne Avenue Store. Moreover, the trial court expressly stated elsewhere in its reasons that “[i]n August of 2008, the same month that the Claiborne Avenue Store opened ...” clearly indicating knowledge and understanding of the correct date of the store’s opening. Accordingly, this assignment is without merit.
Favorable resolution of the arguments set forth in the Plaintiffs’ second,[24] third,[25] fifth[26] and sixth[27] assignments of *936 error require application of the doctrine of | ^contra non valentum as a defense to the Defendants’ plea of prescription. As stated supra, this judicially-created doctrine shall not apply to claims brought pursuant to La. R.S. 12:1502 in order to suspend commencement of prescription and, therefore, does not apply to suspend commencement of prescription in this case. Accordingly, these assignments of error are without merit.
The Plaintiffs’ fourth assignment of error avers the trial court legally erred when it considered communications occurring outside of a MarketFare meeting in its determination of the commencement of prescription. Relying on an unreported federal court decision, Brumley v. Leam Investments, Inc., CIV. 09-1078, 2012 WL 525474 (W.D.La.2/16/2012), the Plaintiffs argue that the only pertinent information a trial court should consider when ascertaining prescription in a derivative action are the records and minutes from the company’s board meetings. Specifically, according to the Plaintiffs, the trial court erroneously “relied on statements allegedly made outside the context of any official Market-Fare meeting, and it did not distinguish between whether those comments were uttered by Marc Robert, a MarketFare member powerless to bind or act on behalf of the company (see p. 7), or by RMC.” The Plaintiffs’ argument is premised on the erroneous notion that the trial court was considering the prescription issue only as 121it related .to RMC’s breach of its fiduciary duties and did not encompass the actions of the other defendants, Marc, Darlene and/or Claiborne LLC. We disagree.
The trial court judgment and its written reasons for judgment clearly confirm that the trial judge’s inquiry included consideration of the Plaintiffs’ claims against all the Defendants, including RMC. Moreover, we do not find that Brumly stands for the proposition that, as manager of MarketFare, RMC could only communicate facts to MarketFare’s members within the confines of official MarketFare meetings and/or that prescription can only commence when a plaintiff obtains information about an alleged wrongful act exclusively from the corporate tortfeasor. The Plaintiffs’ argument also directly contradicts and undermines their proposed theory that Marc, as managing member of *937 RMC, was RMC’s alter ego. We find that logic dictates, and the law on prescription supports, that when' a plaintiff obtains information from any source that sufficiently puts him on notice, actual or constructive, of a claim, prescription on that claim commences to run. Accordingly, the Plaintiffs’ fourth assignment of error is without merit.
In their final assignment of error, the Plaintiffs contend “the trial court committed legal error in imputing the knowledge of one plaintiff to the others.” The Plaintiffs refer to the trial court’s written reasons for judgment wherein the court states that “[a]s soon as any one of the three Plaintiffs knew or should have known that MarketFare was not going to own the Claiborne Avenue Store, prescription for MarketFare’s derivative claim started to run, and prescription |a2could not be suspended or interrupted as a matter of law, until the Plaintiffs filed suit.” Specifically, relying on Bourdais v. New Orleans City, 485 F.3d 294, 297 n. 2 (5th Cir.2007),[28] the Plaintiffs aver that because the Plaintiffs individually brought their claims as separate members of Market-Fare and not as a class action, the trial court erroneously imputed the knowledge of one (ie., André), obtained through disclosures made to him but not to all of the Plaintiffs, to the others. We find the Plaintiffs’ interpretation of the trial court’s reasons are incorrect. The trial court did not impute the knowledge of one plaintiff to the other Plaintiffs as suggested; instead, the trial court held that as soon as any one of the Plaintiffs had knowledge that MarketFare was not going to own the Claiborne Avenue Store, then his knowledge would be imputed to MarketFare for purposes of determining when prescription commenced to run for MarketFare’s derivative claim. Pursuant to La. C.C.P. art. 611, a derivative action brought in Louisiana may be brought by any single member of a corporation or unincorporated association. A limited liability company is treated as an unincorporated association for purposes of derivative actions. La. R.S. 12:1365. Accordingly, once any one of the three individual plaintiffs acquired sufficient knowledge that MarketFare was not going to own the Claiborne Avenue Store, the trial judge correctly ruled that the prescriptive period on MarketFare’s derivative action commenced to run. This assignment of error is without merit.
DECREE
For the foregoing reasons, the judgment of the trial court granting the | ^exception of prescription in favor of the Defendants is affirmed.

AFFIRMED.

McKAY, C.J., concurs.

. By judgment dated 21 May 2014, the 21 April 2014 judgment was designated by the trial court as a final judgment pursuant to La. C.C.P. art. 1915 B.

. Count I of the Plaintiffs' fourth and fifth supplemental and amending petitions consist of a derivative claim for breaches of fiduciary duties for seizure and theft of the Claiborne Avenue Store opportunity described in great *925 er detail within. Count III refers to a derivative claim for civil conspiracy and aiding and abetting breach of fiduciary duties.

. The issue of whether Counts I and III of the Plaintiffs’ derivative action were timely filed has previously been before this court. In December 2011, we reversed the trial court judgment granting the defendants’ exception of prescription, reinstated Counts I and III, and remanded the matter for further proceedings. See Robert v. Robert Mgmt. Co., 11-0406 (La.App. 4 Cir. 12/7/11), 82 So.3d 396.
Immediately prior to the hearing on the Defendants' re-urged exception of prescription upon which the instant appeal is based, the trial court orally dismissed defendants, Marc and Darlene Robert, from Count I (the breach of fiduciary duty claims) on an exception of no cause of action. This court subsequently granted the Plaintiffs’ application for supervisory review and reversed that judgment, but not until after the prescription hearing had been completed.
The Plaintiffs erroneously contend that because the trial court had orally dismissed Marc and Darlene Robert from Count I, and because their dismissal on the exception of no cause of action was not reversed until after the prescription hearing, at the time the prescription hearing was actually held, the trial court only considered whether the Plaintiffs’ suit against defendant, RMC, was timely filed and not whether suit was timely filed against Marc and Darlene Robert. We disagree. At the time the hearing on the exception of prescription was held, no judgment of dismissal had been reduced to writing or signed by the trial judge. Additionally, Marc and Darlene Robert were present at the hearing on their exception of prescription and participated in the proceedings. The 21 April 2014 judgment from which the Plaintiffs now appeal, dismissing Count I of their claims against the Defendants as prescribed, expressly indicates that the trial court considered whether the Plaintiffs’ suit against the Defendants, including Marc and Darlene Robert, was timely filed.
The 21 April 2014 judgment also grants the Defendants’ exception of prescription as to Count III of the Plaintiffs' fourth and fifth supplemental and amending petitions. According to the Plaintiffs, Count III had previously been voluntarily dismissed by judgment dated 9 July 2013, and thus, "was no longer a live claim” at the time the trial court rendered judgment on the Defendants’ exception of prescription as to Count III. In their brief on appeal, the Plaintiffs indicate they have not appealed nor do they contest the trial court's dismissal of Count III.

. The Plaintiffs are also investors in M. Robert Enterprises, Inc. ("MRE”), which was organized by Marc in 1993 to own a grocery store located on Robert E. Lee Boulevard in New Orleans. The Plaintiffs collectively bought 15.2% of the stock in MRE. MRE and MarketFare are separate investments with different minority investors. According to the trial testimony, MRE was a successful venture from its inception. The record substantiates that the Plaintiffs, individually, supplied the cash funds for the acquisition and operation of the grocery stores.

. The remaining minority membership interest in MarketFare is owned by persons not involved in this litigation.

. The fifth lease, on which MarketFare was not the high bidder, was on a closed Schweg-mann grocery store located at the intersection of South Carrollton and South Claiborne Avenues. The record indicates that the Plaintiffs, individually, supplied the cash funds for the acquisition and operation of these four grocery stores, which Marc and Darlene operated through the business organizations, RMC and Robert Resources, Inc. ("Resources”). Resources is another company owned by Marc and Darlene that is managed by RMC, which provides various administrative services to the Subsidiary LLCs.

. Mr. Erath subsequently sold his ownership interest in MarketFare to Marc and Darlene in 2009.

. According to the record, by the end of 2005, of the $6 million indebtedness, MarketFare was indebted to Resources alone for over $3.9 million, which Resources had loaned to the Subsidiary LLCs over the years in order to cover the operating expenses of the stores.

. According to the appellate record, MLR owns the first grocery store opened by Marc in 1993, which is located on West Esplanade Avenue in Jefferson Parish. Marc and Darlene are majority owners of MLR, whereas several Robert family members are minority investors, including Josephine Poche, Cecilia Bono and Charlene Bono. (Josephine and Cecilia also invested in MarketFare.) The Plaintiffs were not investors in MLR. Moreover, in their brief on appeal, the Plaintiffs mischarac-terize this meeting as a "MarketFare meeting,” whereas the record clearly establishes that investors from all three entities were included.

. Another potential grocery store opportunity being explored by Marc was a property located on Harrison Avenue in New Orleans.

. In addition to the Plaintiffs, David Erath, a MarketFare investor, was present at the February 2006 meeting. He testified that he understood that when Marc was presenting the potential opportunities for opening future grocery stores, including an opportunity to build a new store on South Claiborne Avenue, Marc was not presenting these opportunities solely as "MarketFare opportunities.” Mr. Erath testified that at no point in time during any of the discussions relating to future opportunities did he think that MarketFare, of which he owned 5%, could or would own the Claiborne Avenue Store. Mr. Erath’s testimony was corroborated by the trial testimony of •Ms. Lori Schmitt, the CFO for Resources since 2007, who was also present at the investors' meeting. Prior to 2007, Ms. Schmitt • held the' title of Controller for Resources, and she is responsible for all of the accounting, financial reporting, financial schedules, reconciliation of bank accounts and payroll for the company.

.The Plaintiffs in their brief similarly identify this August 2006 meeting as a MarketFare investor meeting, but the record unequivocally establishes that this, like the February 2006 meeting, was a meeting of investors from MLR, MRE and MarketFare, and that the Plaintiffs clearly understood that it was not a meeting solely for MarketFare investors. Plaintiffs' counsel’s characterization of these two meetings as "MarketFare meetings” is blatantly inaccurate and suggestively disingenuous.

.A review of the application for the bond financing, which was in evidence, refutes the Plaintiffs’ assertion that RMC represented that the Plaintiffs, either individually or as investors of MarketFare, would be joint owners of the Claiborne Avenue Store. Exhibit A-l of the application specifically states that "Marc L. Robert, II will be the principal with a minimum of 75% ownership share in this venture. The remaining 25% ownership is expected to be comprised of investors from M. Robert Enterprises, Inc. (Robert E. Lee)." [Emphasis supplied.] The entire application is silent as to the Plaintiffs, individually, and/or as to MarketFare.

. The Plaintiffs' petition has been supplemented and amended five times.

. The Defendants' exception was tried on the pleadings, which, at the time of the hearing held in August 2010, only consisted of the *929 Plaintiffs’ original and first amended petitions.

. The matter was tried on 20 June 2013, 26-27 June 2013, and 2 July 2013.

. Specifically, André testified at the hearing that following an argument he and Marc had on 25 August 2007, wherein Marc advised André that he (Storey and/or Randy) would not own any part of the Claiborne Avenue Store, Marc apologized and the brothers thereafter reconciled with Marc agreeing that he and Darlene would not convert the opportunity for themselves after all. Based on this purported reconciliation that André argues is supported by a series of phone calls that took place between him and Marc during the ensuing days, and due to the Plaintiffs’ ignorance of the lease executed that same month by *930 Claiborne, LLC in August 2007, the Plaintiffs contend they had no reason going forward to ' believe that the Claiborne Avenue Store was being pursued outside of MarketFare. The trial judge rejected this contention as incredible following its review of the totality of the evidence in this case. After our thorough review of the same evidence, and/or the lack thereof (the cell phone records in evidence do not substantiate André’s contention that the alleged phone calls between himself and Marc ever took place), we likewise reject the Plaintiffs' position.

. Exhibit D-20 consists of a 20 January 2009 email from André to Marc, which expresses that André was “shocked” to learn that he— not MarketFare — would not have any ownership in the Claiborne Avenue Store because based on their "heated discussion on this in the fall of 2007,” they had "left it that I would be entitled to the 10% interest that I felt at that time ^that I deserved (but that you didn’t want Randy or the Charbonnet’s [sic] to own any). That is how we left it and that is the presumption that I have had since.” [Emphasis supplied.] The email went on to state that "[o]ur discussion of over a year ago got as heated as it did because I felt that I was being squeezed out of what was rightfully mine.” [Emphasis supplied.]

. In this same August 2008 email from Sto- ' rey to his CPA, Storey also states that "[Mar-ketFare] recently won a $17 million judgment (under appeal now) over the insurance carrier *931 that denied coverage, but I suspect we will receive cash and be done with this one over the next two years. It could work out well for us."

. The Plaintiffs do not appeal the dismissal of Count III. See footnote 3, supra.

. Regarding Randy, the trial court determined that, at the latest, Randy had requisite knowledge in March 2008.

. Heretofore, in prior pleadings and in previous briefs filed in this court, the Plaintiffs took the position that the theft of the Claiborne Store occurred in August 2007, when the Defendants executed the ground lease for the store outside of MarketFare. In their first amended petition, the Plaintiffs alleged that with the "execution of the lease,” the Defendants "delivered the Claiborne Store opportunity to this new LLC entity.” Then, in their fourth amended petition, the Plaintiffs aver that in August 2007, Marc "delivered the Claiborne lease into Claiborne LLC.” In prior briefing on the appeal of the Defendants' first exception, the Plaintiffs reaffirmed that "seizure of the valuable opportunity” giving "rise to a cause of action” occurred in "August of 2007.” For purposes of the Defendants’ exception of prescription, the trial court was required to accept the allegations of the Plaintiffs' petition for damages, as amended, as true. La. C.C.P. art. 1153. See also Denoux v. Vessel Mgnt. Services, Inc., 07-2143, p. 6 (La.5/21/08), 983 So.2d 84, 88 (petition allegations must be accepted as true). Currently, however, relying on Judge Bonin’s concurring opinion in that case, Robert v. Robert Mgmt. Co., supra, wherein he suggested that the opening of the store in July or August of 2008 was the " 'date of the alleged act or omission' for the triggering purposes of La. R.S. 12:1502,” the Plaintiffs have changed their position and allege that the purported theft of the Claiborne Avenue Store opportunity did not occur with the execution of the lease, but rather, actually occurred with the opening of the store in August 2008.

. As noted supra, the viability of Count III is not at issue on this appeal.

. Relying on Plaquemines Parish Com'n Council v. Delta Dev. Co., 502 So.2d 1034 (La.1987), the Plaintiffs aver in their second assignment that the trial court erred in rejecting its argument that "RMC's failure to disclose its acts was critical to consideration of Plaintiffs’ investigation and knowledge of those acts, and thus to the defense of prescription.” In other words, the Plaintiffs claim that after they learned of the Defendants' alleged theft of the Claiborne Avenue Store opportunity, prescription was suspended because of Marc’s purported concealment of certain salient facts (i.e., formation of Claiborne LLC, execution of the ground lease in the name of Claiborne LLC, efforts to obtain special financing and tax credits) and, thus, did not commence to run until such time as full disclosure was made by Marc or RMC to the Plaintiffs. We disagree. First, the trial court judgment and reasons therefor are devoid of any factual finding by the trial judge that the Defendants concealed the alleged theft of the Claiborne Avenue Store opportunity. Moreover, the Plaquemines Parish case is completely inopposite to the instant case.
It involved a declaratory judgment action against an attorney governed by a 10-year liberative prescriptive period pursuant to La. C.C. art. 3499, wherein the Supreme Court held that the doctrine of contra non valentum applied to suspend prescription, not a claim against a manager of an LLC brought under La. R.S. 12:1502, which provides for a unique “hybrid” prescriptive/peremptive period prohibiting suspension on any grounds. Suhren, 10-0767 at p. 10, 55 So.3d at 947.

. The Plaintiffs’ third and fifth assignments contend the trial court erred in finding that prescription commenced before the injurious act occurred and any damages were sustained. On appeal, the Plaintiffs contend the "overt act [triggering prescription] was the August 2008 opening of the Claiborne store outside of MarketFare,” and that their damages did not occur until that date. According to the Plaintiffs, because of Marc’s concealment, they could not have discovered the theft of the Claiborne Avenue Store opportunity before the actual opening of the store when, prior to that time, they had at most a mere *936 "apprehension,” which is insufficient to constitute constructive knowledge, that something could be wrong. In previous pleadings filed and prior briefing to this court, however, the Plaintiffs averred that the "theft” of the Claiborne Avenue Store opportunity occurred when the ground lease was executed by Claiborne LLC in August 2007. Moreover, the trial court found, and the record on appeal supports, that each of the Plaintiffs knew or should have known by August 2007 of the theft of the Claiborne Avenue Store opportunity. Under La. R.S. 12:1502, prescription is triggered when a plaintiff discovers or should have discovered the wrongful act, not by proof of damages, which need not be quantifiable or fully incurred, but be only more than mere speculation, before a plaintiff has a right of action. See Bailey v. Khomy, 04-0620, p. 10 (La. 1/20/05), 891 So.2d 1268, 1276.

. See Footnote 23.

. The Plaintiffs' sixth assignment of error avers the trial court erred in failing to find that prescription was tolled by Marc's alleged disavowal and his concealment of his intent to steal the corporate opportunity by stringing the Plaintiffs along. Again, La. R.S. 12:1502 E expressly prohibits suspension or interruption of prescription other than by timely filing suit. Consequently, any actions taken by Marc subsequent to the Plaintiffs having gained knowledge, either actual or constructive, of the theft of the Claiborne Avenue Store opportunity could not suspend or interrupt the time limitations in this case. The trial court did not err.

. Applying Louisiana law, Bourdais held that in the absence of a class action, "if certain plaintiff's knew or should have known of their causes of action that would not impute the same knowledge to all of the plaintiffs.” Bourdais, 485 F.3d at 298 n. 2.