Judge Rosemary Ledet
This is a complex commercial litigation suit. In the various iterations of the petition,[1] the plaintiff, Thomas Pike Barkerding, named over fifty defendants and asserted almost a dozen causes of action. At this juncture, only six defendants and four causes of action remain. Those six defendants can be divided into the following two groups:
(i) Stone Pigman Walther Wittmann, LLC ("Stone Pigman"); Scott Whittaker; and William Bishop (collectively, the "Stone Pigman Defendants"); and
(ii) Cara Stone, LLP ("Cara Stone"); Graffagnini, A Law Corporation; and Mark Graffagnini (collectively, the "Cara Stone Defendants").
The first remaining cause of action, which is asserted only against the Stone Pigman Defendants, is "legal malpractice and breach of fiduciary duty" (the "Malpractice Claims").[2] The other three remaining causes of action, which are asserted against all six remaining defendants, are "fraudulent and/or intentional *1174 misrepresentations and/or detrimental reliance" (the "Fraud Claims"); Louisiana Unfair Trade Practice Act ("LUTPA") violations (the "LUTPA Claims"); and conspiracy (the "Conspiracy Claims").
In response to Mr. Barkerding's claims, the Stone Pigman Defendants and the Cara Stone Defendants both filed various peremptory exceptions-including exceptions of prescription,[3] no cause of action, and no right of action. Following several hearings, the trial court rendered multiple judgments. The effect of those judgments was to dismiss all the claims against both the Stone Pigman Defendants[4] and the Cara Stone Defendants.[5] From those judgments, Mr. Barkerding appeals. Both the Stone Pigman Defendants and the Cara Stone Defendants answered the appeal. For the reasons that follow, we affirm.
FACTUAL AND PROCEDURAL BACKGROUND
In November 2013, Mr. Barkerding formed SmartPak, LLC ("SmartPak") to finance and develop a patented invention-an integrated "koozie"[6] and carry-case for packages (four and six) of bottled beverages, such as beer (the "Invention"). Robert Post, an experienced cardboard package designer, assisted Mr. Barkerding in developing the Invention.
Using an on-line legal form, Mr. Barkerding drafted SmartPak's first operating agreement, which was dated November 21, 2013.[7] In the agreement, Mr. Barkerding *1175 was designated as SmartPak's manager and its chief executive officer. The agreement also included a requirement of unanimous written consent of the existing SmartPak members to admit new members.
In July 2014, Mr. Barkerding met with the chief marketing officer of one of the major beer conglomerates, who confirmed the potential market demand for the Invention. Thereafter, Mr. Barkerding sought to obtain additional capital for SmartPak. Two principals of SmartPak members-Jack Carrere (Carrere Consulting LLC) and Alex Goss (Goss Ventures LLC)-also were involved with a new local funding group called NO/LA Angel Network ("NOLAAN").[8] Mr. Carrere and Mr. Goss urged Mr. Barkerding to approach NOLAAN for the capital. In August 2014, Mr. Carrere and Mr. Goss introduced Mr. Barkerding to Dann Schwartz, a prominent NOLAAN member. Mr. Schwartz forwarded to Mr. Barkerding an email from Mr. Whittaker regarding the newly launched, Stone Pigman CornerStone Program, which was designed to provide start-up businesses with legal services to help them grow and to protect their businesses.
On September 27, 2014, Mr. Barkerding first communicated with the Stone Pigman Defendants. On that date, he submitted a CornerStone Program application "on behalf of SmartPak, LLC." The application expressly indicated that it would not create an attorney-client relationship. The following week Mr. Barkerding met with representatives of Stone Pigman.
In October 2014, Mr. Schwartz became a SmartPak member. At this time, Mr. Schwartz was serving on NOLAAN's board. In November 2014, Mr. Schwartz advised Mr. Barkerding that, in order for NOLAAN to invest in SmartPak, the company needed to obtain corporate counsel. Mr. Barkerding's first choice for corporate counsel was Carver Darden-a law firm that Mr. Barkerding had previously engaged before he formed SmartPak to assist with the intellectual property ("IP") rights, especially in obtaining the patents for the Invention. In response to Mr. Barkerding's inquiry as to whether Carver Darden could expand their representation to include the company, Carver Darden sent an outline of complex legal steps that were required before they could switch from representing Mr. Barkerding, individually, to representing the company itself. Those legal steps included a unanimous consent resolution, signed by all of SmartPak's members, authorizing SmartPak to sign a summary engagement memorandum; an arbitration disclosure and consent document; and an appropriate conflicts waiver.
According to Mr. Barkerding, before he had time to read and to interpret the information that Carver Darden sent to him, Mr. Schwartz instructed him to tell Carver Darden to stop any further work and to transfer all patent concerns to another firm, AdamsIP. Mr. Barkerding complied. Mr. Schwartz then arranged with Mr. Whittaker for Stone Pigman to become SmartPak's corporate counsel.
In late November 2014, Stone Pigman began representing SmartPak in connection with obtaining Series A investment through NOLAAN (the "Series A Financing"). In connection with the Series A Financing, *1176 NOLAAN was represented by Mr. Graffagnini, who also was a NOLAAN board member.[9]
On December 1, 2014, Mr. Barkerding made his pitch to a preliminary panel of NOLAAN's members, requesting $150,000 in funding. At the end of his pitch, the head of NOLAAN, Mike Eckert, announced NOLAAN's interest in oversubscribing to the funding round (providing $350,000 in funding).
On December 5, 2014, Mr. Whittaker emailed a copy of Stone Pigman's letter of engagement to Mr. Barkerding. This letter indicated that Stone Pigman would represent SmartPak, that Mr. Whittaker would be primarily responsible for this representation, and that Mr. Bishop and other Stone Pigman lawyers would be involved as appropriate. This letter stated that the initial projects that Stone Pigman would be handling included revising SmartPak's operating agreement and closing the contemplated seed money investment round. This letter did not disclose any conflicts of interest or mention Mr. Whittaker's membership on NOLAAN's board. According to Mr. Barkerding, Mr. Whittaker told him not to sign the first letter. The first letter was never executed. In response to Mr. Schwartz's request, on December 8, 2014, Mr. Whittaker sent a revised engagement letter with SmartPak, which likewise did not disclose Mr. Whittaker's membership on NOLAAN's board. The second letter, like the first one, was never executed.
Three days later, on December 11, 2014, Mr. Barkerding made his formal pitch to NOLAAN's full membership. Mr. Whittaker testified that he was present at the meeting when Mr. Barkerding made his formal pitch. According to Mr. Whittaker, he spoke to Mr. Barkerding at the meeting and told Mr. Barkerding that he had been a founding member of NOLAAN and that he presently was serving on NOLAAN's board. Mr. Barkerding did not recall having that conversation and denied being provided that information at the meeting.
On December 19, 2014, Mr. Bishop, Mr. Whittaker's associate at Stone Pigman, sent a "Revised Term Sheet" to Mr. Graffagnini, NOLAAN's counsel, stating:
Attached are clean and marked drafts of the term sheet based on our meeting today. Per our discussion, the issue of dilution protection, in particular with respect to future equity raises with low valuations, remains unresolved. I am also circulating the attached to my client simultaneously and, as such, it remains subject to his further review and comment.
(Emphasis supplied).
On January 8, 2015, Mr. Whittaker sent Mr. Barkerding a third, revised engagement letter. In the transmittal email, Mr. Whittaker stated that he had previously spoken to Mr. Barkerding, in person, about a waiver of any conflicts regarding NOLAAN. The third letter included the following new paragraph regarding conflict of interest matters:
Conflict of Interest Matters. SmartPak acknowledges that Stone Pigman represents NO/LA Angel Network from time to time in connection with certain investment transactions, and I serve on the Board of Directors of NO/LA Angel Network. Furthermore, Stone Pigman may represent certain members of NO/LA Angel Network who may participate in the contemplated Series A Financing.
*1177 To the extent that these circumstances present a conflict of interest under the Louisiana Rules of Professional Conduct, SmartPak hereby grants its informed consent and waiver with respect to such conflict(s) of interest, it being understood, however, that Stone Pigman would not represent NO/LA Angel Network or any of its members in connection with Series A Financing or any other matter adverse to SmartPak.
In the third letter, as in the prior two letters, the client is identified as SmartPak. The third letter stated that the initial services Stone Pigman would perform included revising the SmartPak operating agreement and documenting and closing the contemplated NOLAAN Series A Financing. On January 9, 2015, Mr. Barkerding, as SmartPak's CEO, signed the third letter and emailed it back to Mr. Whittaker.
On January 21, 2015, the NOLAAN Series A Financing closed.[10] In connection with the closing, multiple contracts were signed, including the Employment Agreement and the Assignment/Non-Disparagement Agreement between SmartPak and Mr. Barkerding.[11] The Amended and Restated Operating Agreement also was executed on that date.
Shortly after the NOLAAN Series A Financing closing on January 21, 2015, Mr. Barkerding began having conflicts with SmartPak's other board members. On September 25, 2015, Mr. Whittaker, in his capacity as SmartPak's attorney, sent a letter to Mr. Barkerding addressing Mr. Bakerding's conflicts with the other board members, which were allegedly harming the company. Mr. Whittaker informed Mr. Barkerding that he should bring his own attorney to a meeting with the other board members. On October 25, 2015, Mr. Barkerding sent an email to all the SmartPak board members addressing his concerns and stating that he did not have "legal guidance" and that he believed it would further complicate matters to bring in additional counsel. Also, in October 2015, Mr. Barkerding was removed as CEO; he remained, however, as Chief Product Officer until his employment contract expired.
At the SmartPak January 19, 2016 board meeting, Mr. Barkerding advised the other board members that he felt they were trying to remove him from the company; and he abruptly left the meeting. During 2016, Mr. Barkerding retained three successive attorneys to represent him in his dispute with the other SmartPak board members.
On February 7, 2016, Bob Ellis, the first attorney Mr. Barkerding retained, emailed Mr. Whittaker to request a meeting about Mr. Barkerding's concerns. At the next board meeting, Mr. Barkerding expressed his displeasure regarding the Class AA Financing round.
On February 26, 2016, the second attorney Mr. Barkerding retained, Scott Galante, emailed Mr. Whittaker requesting certain documents; Mr. Galante stated that Mr. Whittaker "ha[d] the ability and the responsibility to clear up these issues for me and my client as attorney for the entity." Mr. Galante further stated that Mr. Whittaker was "employed to work for the organization as a professional which includes my client's interest." Later that day, Mr. Galante sent another email to Mr. *1178 Whittaker in which he stated that he believed his "client ha[d], at his disposal, several different causes of action to protect his interest." On March 1, 2016, Mr. Galante sent another email to Mr. Whittaker stating that he would be advising his client "to formally move to have [Mr. Whittaker] and [his] firm removed as counsel for SmartPak ... [e]specially in light of the fact that [Mr. Whittaker] ha[d] disclosed that the individual investors are separately represented."
On April 1, 2016, Mr. Galante wrote a letter to Mr. Whittaker informing him that Mr. Barkerding had an issue with the issuance of additional stock, which would expose him to dilution. In bold, Mr. Galante stated in the letter:
Please be advised at this time my client is NOT threatening to sue SmartPak as an entity in regards to the upcoming issuance as has been alleged. However, my client has significant questions arising from and issues with the individual investors of SmartPak who comprise the majority of its Management Board.
On April 5, 2016, Mr. Whittaker responded, advising that the other SmartPak investors were "seriously considering filing suit against Mr. Barkerding for monetary and injunctive relief to recover the damages he has caused and to prevent future damage." Mr. Whittaker further summarized Mr. Barkerding's belief-that SmartPak's other board members and its attorneys were engaging in a "nefarious scheme"-as follows:
In a nutshell, the situation from the company's perspective is that Mr. Barkerding has for some reason formed a belief that the other Board members and the company attorneys are conspiring to achieve the goal of diluting Mr. Barkerding's ownership interest, rather than exercising their business judgment and rendering legal advice to achieve the goal of maximizing company value for the benefit of all members.
At the April 15, 2016 board meeting, the issue of the "legal cloud" created by Mr. Barkerding's threat to file suit was raised. The minutes stated that "Mr. Eckert [the head of NOLAAN] reminded the Board that the legal cloud and threat of litigation from Mr. Barkerding depressed the valuation [of SmartPak]." Mr. Barkerding responded that "he engaged Mr. Galante solely to protect his own interests and that of the members that helped co-found the Company."
On April 28, 2016, Mr. Barkerding posted online a video that he prepared and emailed a copy of a link to the video to various parties. In the video, Mr. Barkerding stated that the Stone Pigman Defendants had a "clear conflict of interest." In the video, he explained the conflict as follows:
Soon after the successful pitch to [NOLAAN], Mr. Schwartz introduced the CEO to Scott Whittaker as SmartPak's tentative corporate counsel. It was later learned that Mr. Whittaker is a long-time neighbor of Mr. Schwartz and serves on the board of directors for [NOLAAN]. Mr. Whittaker's involvement with NOLAAN was a clear conflict of interest. Before formal engagement, Mr. Whittaker prompted the CEO to waive this conflict, and by that time, the CEO had grown to trust the arrangement, and with the combined influence of good faith, the eagerness to move forward and total ignorance of the impact this could have, he signed the waiver.
Thereafter, Mr. Barkerding offered to sell all or a portion of his shares in SmartPak (the "Buy Out"). In connection with the Buy Out, Mr. Barkerding recorded two phone calls that he had with Mr. Whittaker-one on October 28, 2016; the other on *1179 November 23, 2016. In the November 23, 2016 phone call, Mr. Whittaker recounted the events leading up to the Series A Financing and stated that "so that was your attorney negotiating for you ." (Emphasis supplied).
On February 22, 2017, SmartPak, represented by Stone Pigman, filed suit against Mr. Barkerding in Civil District Court for the Parish of Orleans, captioned SmartPak v. Barkerding , No. 17-1715 (the "SmartPak Case"). In that suit, SmartPak sought injunctive relief, including a temporary restraining order, to enforce the non-disparagement and confidentiality provisions of the Employment Agreement and Assignment/Non-Disparagement Agreement. It also sought to recover damages for the breaches of Mr. Barkerding's breach of fiduciary duties to SmartPak. In response, Mr. Barkerding filed a motion to disqualify Stone Pigman from continuing to serve as SmartPak's counsel in the SmartPak Case. In support, Mr. Barkerding cited the fact that Stone Pigman had multiple conflicts of interest.
On August 8, 2017, Mr. Barkerding filed this action against multiple defendants. Thereafter, he amended the petition three times. The only remaining defendants, as noted elsewhere in this opinion, are the Stone Pigman Defendants and the Cara Stone Defendants. The gist of Mr. Barkerding's allegations is that the defendants conspired to wrest control of his company, SmartPak, away from him, or knew of such a plan and benefitted from it. He alleges that the Stone Pigman Defendants conspired with other board members from NOLAAN and its attorneys, the Cara Stone Defendants, to dilute his shares by misleading him into signing contracts to his detriment. He further alleges that this was accomplished by Mr. Whittaker holding himself out to be Mr. Barkerding's personal attorney, instead of informing Mr. Barkerding that he was counsel for SmartPak, as a whole. Mr. Barkerding still further alleges that he would not have signed various foundational documents for SmartPak had he known that Mr. Whittaker was not advocating and protecting his personal interests.
Both the Stone Pigman Defendants and the Cara Stone Defendants filed various peremptory exceptions to the iterations of the petition. Following an evidentiary hearing on the Stone Pigman Defendants' exceptions of no right of action and prescription at which three witnesses, including Mr. Barkerding and Mr. Whittaker, testified and evidence was introduced, the trial court sustained most of the Stone Pigman Defendants exceptions[12] and dismissed Stone Pigman as a defendant. Following another hearing, the trial court sustained most of the Cara Stone Defendants exceptions[13] and dismissed Cara Stone as a defendant. Both groups of defendants were dismissed based on the trial court's findings that all the claims against them with the exception of the Conspiracy Claims were prescribed. The Conspiracy Claims against them were dismissed based on the trial court's ruling sustaining their exceptions of no cause of action.
Although Mr. Barkerding asserts multiple assignments of error on appeal, we frame the narrow issue before us as whether the trial court erred in its rulings on the various peremptory exceptions of *1180 prescription, no cause of action, and no right of action.
STANDARD OF REVIEW
In addressing the trial court's judgment sustaining the exceptions of no right of action and no cause of action, we apply a de novo standard of review because these exceptions raise a question of law. N. Clark, L.L.C. v. Chisesi , 16-0599, p. 3 (La. App. 4 Cir. 12/7/16), 206 So.3d 1013, 1015 (exception of no right of action); Herman v. Tracage Dev., L.L.C. , 16-0082, 16-0083, p. 4 (La. App. 4 Cir. 9/21/16), 201 So.3d 935, 939 (exception of no cause of action).
In addressing the trial court's judgment sustaining the exceptions of prescription, the standard of review varies based on whether evidence was introduced in the trial court at the hearing on the exception. State v. Thompson , 16-0409, p. 18 (La. App. 4 Cir. 11/23/16), 204 So.3d 1019, 1031 (citing Miralda v. Gonzalez , 14-0888, pp. 17-18 (La. App. 4 Cir. 2/4/15), 160 So.3d 998, 1009 ). "When prescription is raised by peremptory exception, with evidence being introduced at the hearing on the exception, the trial court's findings of fact on the issue of prescription are subject to the manifest error-clearly wrong standard of review." In re Med. Review Panel of Hurst , 16-0934, p. 4 (La. App. 4 Cir. 5/3/17), 220 So.3d 121, 125-26. When no evidence is introduced, the de novo standard applies. Denoux v. Vessel Mgmt. Servs., Inc ., 07-2143, p. 6 (La. 5/21/08), 983 So.2d 84, 88 (observing that "[i]n the absence of evidence, the exception of prescription must be decided on the facts alleged in the petition, which are accepted as true").
Ordinarily, the exceptor bears the burden of proof at the trial of the peremptory exception of prescription. Rando v. Anco Insulations, Inc ., 08-1163, 08-1169, p. 20 (La. 5/22/99), 16 So.3d 1065, 1082 (citing Carter v. Haygood , 04-0646 (La. 1/19/05), 892 So.2d 1261, 1267 ). If prescription is evident on the face of the petition, the burden shifts to the plaintiff to show the action is not prescribed. Id .
"Peremption has been likened to prescription; namely, it is prescription that is not subject to interruption or suspension." Id. (citing Flowers, Inc. v. Rausch , 364 So.2d 928, 931 (La. 1978) ). As such, the same principles applicable to prescription also apply to peremption. Id. "[Peremptive] statutes, like all prescription statutes, are strictly construed against prescription and in favor of maintaining the cause of action." Dominion Expl. & Prod., Inc. v. Waters , 07-0386, 07-0287, p. 8 (La. App. 4 Cir. 11/14/07), 972 So.2d 350, 357 (citing Wimberly v. Gatch , 93-2361 (La. 4/11/94), 635 So.2d 206, 211 ). "Of the possible constructions, the one that maintains enforcement of the claim or action, rather than the one that bars enforcement should be adopted." Rando , 08-1163, p. 21, 16 So.3d at 1083.
"The standard of review changes when an appellate court reviews alleged legal errors committed by the trial court. When reviewing legal errors, an appellate court is required to review the record de novo ." Robert v. Robert Mgmt. Co., LLC , 14-0822, p. 15 (La. App. 4 Cir. 2/11/15), 164 So.3d 922, 933. "A legal error occurs when a trial court applies incorrect legal principles of law and those errors are prejudicial such that they materially affect the outcome and deprive a party of substantial rights." Id .
DISCUSSION
In addressing the issues presented here, we organize our analysis around the four remaining causes of action-the Malpractice Claims; the Fraud Claims; the LUTPA Claims; and the Conspiracy Claims.
*1181 The Malpractice Claims
In his petition, Mr. Barkerding groups his legal malpractice and breach of fiduciary duty claims together into one cause of action under the same heading-"First Cause of Action: Malpractice and Breach of Fiduciary Duty against Scott Whittaker, William Bishop, and the law firm of Stone Pigman Walther Wittmann, LLC." The paragraphs beneath the heading do not distinguish between the malpractice and breach of fiduciary duty claims. Both claims rely on the same factual allegations. Both claims are premised on the existence of an attorney-client relationship between Mr. Barkerding and the Stone Pigman Defendants.
In response, the Stone Pigman Defendants filed, among other things, a peremptory exception of no right of action. In support, the Stone Pigman Defendants cited the lack of an attorney-client relationship. Following the evidentiary hearing, the trial court sustained in part and overruled in part the exception of no right of action, finding that "Mr. Barkerding had a right of action in legal malpractice against the Stone Pigman [D]efendants vis-à-vis the Series A negotiations; however, his right of action terminated upon the signing of the letter of engagement," which occurred on January 9, 2015. On appeal, the Stone Pigman Defendants contend that the trial court erred in failing to sustain their exception of no right of action in full.[14] We find this argument persuasive.
An attorney-client relationship is a threshold requirement for a legal malpractice cause of action. Dawson v. Gray & Gray , 18-0380, p. 4 (La. App. 4 Cir. 10/24/18), --- So.3d ----, ----, 2018 WL 5284316, *2. In Louisiana, the existence of an attorney-client relationship turns largely on the client's subjective belief that such a relationship exists. In re Austin , 06-0630, pp. 6-7 (La. 11/29/06), 943 So.2d 341, 348 (citing La. State Bar Ass'n v. Bosworth , 481 So.2d 567, 571 (La. 1986) ). "Nonetheless, the overarching question is whether there is a reasonable, objective basis to determine that an attorney-client relationship has formed." Austin , 06-0630, p. 11, 943 So.2d at 348 (citing Sheinkopf v. Stone , 927 F.2d 1259 (1st Cir. 1991) ).
Summarizing the governing rule, one commentator has observed:
The claimant's subjective belief does not establish an attorney-client relationship unless the lawyer reasonably induced that belief. Some courts, however, have said that the standard is the claimant's subjective belief, but such remarks usually have been qualified by explaining *1182 that the belief was "reasonable." That, of course, is an objective standard.
Ronald E. Mallen and Jeffrey M. Smith, 1 LEGAL MALPRACTICE § 8:16 (2018 ed.); see also Feingerts v. D'Anna , 17-0321, 17-0322, p. 9 (La. App. 4 Cir. 1/10/18), 237 So.3d 21, 28. Thus, an objective standard applies in determining whether an attorney-client relationship exists.
Here, no express attorney-client relationship was ever created between Mr. Barkerding and the Stone Pigman Defendants. As the trial court noted in its reasons for judgment, "Mr. Barkerding was never sent a bill for legal services, never personally paid a legal bill, and never signed an engagement letter in his personal capacity." Nonetheless, the trial court found an implied attorney-client relationship for the period during which the Series A Financing was being negotiated. Although the trial court did not identify a beginning date for the implied relationship, it identified the ending date as the date on which Mr. Barkerding, on SmartPak's behalf, signed the Stone Pigman engagement letter, January 9, 2015.
In finding that Mr. Barkerding had a reasonable basis for his belief that the Stone Pigman Defendants were protecting his personal interests during the Series A Negotiations, the trial court, in its reasons for judgment, stated as follows:
This Court does not find Mr. Barkerding's belief that his interest during the Series A negotiations was being protected by the Stone Pigman [D]efendants was unreasonable. The first two draft engagement letters did not address any potential conflicts between the Stone [Pigman] [D]efendants and SmartPak or Mr. Barkerding. Mr. Barkerding created the product, was the majority owner of the membership interest, and was the company's CEO at the time of the negotiation. Mr. Barkerding would have been the company's representative during the negotiations with the NOLAAN group. His personal and corporate role was inextricably intertwined. Moreover, Mr. Barkerding prepared the operating agreement that outlined the process for admitting new members, as would happen under the Series A sale. Mr. Barkerding and his members had to unanimously agree on any issue which increased the membership of SmartPak. The Stone Pigman [D]efendants should have known that any act by Mr. Barkerding in his official capacity might impact his ownership interest, i.e., dilution, of the company.
The trial court, however, rejected as unreasonable Mr. Barkerding's argument that "he did not become aware that the Stone Pigman [D]efendants were not representing him until the temporary restraining order [in the SmartPak Case] was filed against him in February of 2017." Instead, the trial court found that Mr. Barkerding's belief that the Stone Pigman Defendants continued to act as his attorneys after the Series A financing was "belied by subsequent events." The subsequent events, the trial court noted, included Mr. Barkerding signing the letter of engagement on behalf of SmartPak on January 9, 2015; the letter expressly provided that Stone Pigman represented SmartPak. In the letter, the trial court emphasized that "Mr. Whittaker explained to Mr. Barkerding in writing that Mr. Whittaker was on the board of NOLAAN and may represent various members of NOLAAN in the Series A financing." The trial court thus concluded that Mr. Barkerding had a right of action in legal malpractice against the Stone Pigman Defendants as to the Series A negotiation; however, "his right of action terminated upon the signing of the letter of engagement." The trial court thus denied the Stone Pigman Defendants' exception of no right of action in part.
*1183 On appeal, the Stone Pigman Defendants contend that the trial court erred in failing to sustain their exception of no right of action in full. They contend there was no attorney-client relationship-express or implied-between them and Mr. Barkerding. They contend that the trial court's reliance on the fact Mr. Barkerding's "personal and corporate role[s] [were] inextricably intertwined" as supporting a finding that he reasonably believed he was being represented was misplaced. Stated another way, they contend that Mr. Barkerding's status as SmartPak's founding member, then CEO, and largest shareholder did not automatically create an attorney-client relationship.
The Stone Pigman Defendants cite International Strategies Group, Ltd. v. Greenberg Traurig, LLP , 482 F.3d 1 (1st Cir. 2007), as involving a very similar situation and supporting their position.[15] They note that, in International Strategies , the plaintiff, ISG, was a company that invested millions in another company, COB. ISG contended that COB engaged in a Ponzi scheme. COB, conversely, contended that it was the victim of the Ponzi scheme and hired an attorney, Mr. Pappalardo, to seek recovery of the money it invested. COB's attorney met with both COB and COB's investors, including ISG. The attorney told ISG that he hoped his efforts to recover the funds would benefit not only COB, but also ISG. When the attorney failed to recover the funds, ISG sued, among others, the attorney, asserting multiple claims including legal malpractice and unfair trade practices. ISG contended that it had a reasonable belief the attorney was representing it.
The trial court granted the attorney's motion for summary judgment. On appeal, ISG contended that, based on the attorney's assurance that he represented the interests of the investors and the attorney's warnings that filing independent charges would jeopardize his attempts to negotiate a recovery of the funds, "ISG reasonably believed that [Mr.] Pappalardo was its attorney and forebore from pursuing independent legal action on that basis." International Strategies , 482 F.3d at 8. Conversely, the attorney contended that he "made clear that he only represented COB, and ISG demonstrated an understanding of this fact; that ISG never relied on [Mr.] Pappalardo for legal services; and that ISG, as a sophisticated, represented entity, understood that its position was potentially adverse to [Mr.] Pappalardo's client, and indeed threatened suit against COB on this basis several times." Id .
Affirming, the appellate court reasoned that although ISG might have reasonably believed it would benefit from the attorney's work, ISG had no reasonable belief that it was actually being represented by the attorney. Finding no express relationship, *1184 the court emphasized the lack of any evidence of a retainer agreement or other contract for legal services between ISG and any of the defendants as well as the lack of any billing or remittances for such services. International Strategies , 482 F.3d at 7. Finding no implied relationship, the court reasoned that "the record indicates that ISG did not explicitly request legal representation from Pappalardo, nor did it seek advice regarding its own legal position vis-à-vis the entities implicated in the fraud." Id. at 10. The court thus found no reasonable fact finder could conclude that an attorney-client relationship was created, either expressly or impliedly.
The Stone Pigman Defendants contend that the same is true here, substituting Mr. Barkerding for ISG and SmartPak for COB. Continuing, the Stone Pigman Defendants cite the following non-exclusive list of factors as establishing that Mr. Barkerding could not have reasonably believed he was represented by Stone Pigman:
• [Mr.] Barkerding was not unsophisticated. He was an inventor who had already started two other companies, and he had retained the Carver Darden law firm as his intellectual property counsel to draft and file a patent for his innovative six-pack design.[16]
• When [Mr.] Barkerding first began to search for corporate counsel for SmartPak, he was advised in writing by Carver Darden that no law firm could represent both [Mr.] Barkerding and SmartPak because their interests could someday conflict.
• When [Mr.] Barkerding subsequently selected Stone Pigman to serve as SmartPak's corporate counsel, [Mr.] Barkerding signed an engagement letter on behalf of SmartPak for Stone Pigman to represent only SmartPak, not [Mr.] Barkerding.
• When [Mr.] Barkerding looked to sell shares he owned in SmartPak in January, 2015, he was advised in writing by Stone Pigman that it was acting only "as counsel for the company" and not as counsel for [Mr.] Barkerding. [Mr.] Barkerding replied "good to know, thanks for clarifying."[17]
*1185 • When [Mr.] Barkerding's interests began to conflict with those of SmartPak, he stated in writing that he had no counsel advising him and that he thought to do so would "complicate matters, and I wish to continue avoiding it."
• When [Mr.] Barkerding eventually changed his mind and retained personal counsel-indeed, a series of four separate lawyers-none were Stone Pigman, and none ever contended that Stone Pigman ever represented [Mr.] Barkerding.
Mr. Barkerding's counter argument, as the trial court noted in its reasons for judgment, is as follows:
Mr. Barkerding counters by suggesting that he was tricked into hiring the Stone Pigman [D]efendants, who "after procuring [his] trust, appearing to negotiate on his behalf while actively concealing his own conflicts of interests, turned on [him]." Mr. Barkerding does not dispute the fact that he formed previous companies. Rather, he argues that the companies were formed without the help of lawyer[s], and, although funded by outside investors, he never raised capital "from a fund in relation to the formation or operation of these other entities as was done here." He notes that the simplicity of forming the prior companies pales in comparison to the complexity of the SmartPak deal. His two companies previous were created using online legal forms; he also testified that he brought together investors for his online clothing company, Upperline Clothiers.
Mr. Barkerding offers that the Stone Pigman [D]efendants failed to explain the distinctions between the representation of an individual versus the representation of the company at the time of the Series A financing. They allegedly did not disclose to him that they were only representing SmartPak, that there were possible conflicts between [Mr.] Barkerding's interests and any other party's interest, or that they were representing other parties whose interests conflicted with Mr. Barkerding's. Finally, Stone Pigman did not inform Mr. Barkerding that he should seek independent counsel to protect his interest.
* * *
Mr. Barkerding testified that it was his belief that Stone Pigman was representing his interests during the Series A funding round. He stated that Mr. Whittaker heavily influenced his decision making, and had "all of his faith." Mr. Whittaker walked him through the term sheet and advised him to sign the document. Mr. Barkerding relied upon Stone Pigman's advice to allow incoming investors to have veto rights on the company's second common board seat, which would unbalance the board. He also stated that Mr. Whittaker advised him to sign away control of his entire company.[18]
We find, as the Stone Pigman Defendants contend, that even if Mr. Barkerding subjectively believed that he was indirectly benefiting from Stone Pigman's representation, he could not have reasonably believed he was represented by Stone Pigman. See Int'l Strategies Grp., supra. He *1186 was told by his own former counsel, Carver Darden, that no law firm could represent both him and SmartPak; as the trial court noted, the Carver Darden attorney email to Mr. Barkerding stated that "[i]n order to represent SmartPak, we will need to formally disengage you as [a] client of the firm." This is not a case in which the plaintiff, individually, was previously represented by the attorney. From the outset of his interactions with the Stone Pigman firm-beginning with the CornerStone application-Mr. Barkerding expressly identified the client as the company, SmartPak. SmartPak was already formed and had six members when Stone Pigman was retained. The record contains multiple written documents establishing that SmartPak, the company, was the only client. It is well settled that "[a] lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents." LA. RULES PROF. CONDUCT, Rule 1.13(a).[19] Such is the case here.
For these reasons, we find the trial court erred in failing to sustain, in full, the Stone Pigman Defendants peremptory exception of no right of action as to the Malpractice Claims. We affirm the trial court's dismissal of this cause of action, albeit for this different reason. We thus pretermit addressing whether the trial court erred in dismissing Mr. Barkerding's Malpractice Claims based on a peremptory exception of prescription pursuant to La. R.S. 9:5605.[20]
The Fraud Claims
The second remaining cause of action is the Fraud Claims, which Mr. Barkerding asserted against both groups of defendants. The allegations in the petition regarding the Fraud Claims are as follows:
[A]bsent the misrepresentation to Mr. Barkerding that his personal interests in the transactions were being advocated and protected by Messrs. Whittaker and Bishop, Mr. Barkerding would not have provided his consent to the terms of these transactions. Mr. Barkerding would not have provided his consent to his detriment in reliance on these fraudulent and/or intentional misrepresentations. As a result, Mr. Barkerding lost majority control and ownership of his company, SmartPak, several assets related thereto, such as the two patents, and agreed to other onerous contractual *1187 terms, such as those contained in the Employment Agreement and the Assignment of Intellectual Property, Non-Competition, Non-Solicitation, and Non-Disparagement Agreement.
The trial court found that as to the allegations in the Petition between "the Series A negotiations and the September 25th, 2015 letter from [Mr.] Whittaker to [Mr.] Barkerding," the Petition stated a cause of action against both groups of defendants on the Fraud Claims. We find no error in this ruling insofar as it applies to the Stone Pigman Defendants; as to the Cara Stone Defendants, however, we find that the allegations of the Petition fail to state a cause of action for fraud.
The narrow basis that Mr. Barkerding relies upon for joining the Cara Stone Defendants in this suit is set forth in the following two paragraphs of the petition:
87. Furthermore, once these revisions [to the Term Sheet] were made, Mr. Bishop sent the "Revised Term Sheet" on December 19 to Mr. Mark Graffagnini, the attorney for the NOLAAN group, with a carbon copy (cc) to Mr. Michael Eckert, the titular head of NOLAAN and soon-to-be board member of SmartPak, and to Mr. Whittaker. That is, Mr. Bishop sent the next iteration of the main negotiating document to the other side of the contemplated deal, and stated: "Mark, Attached are clean and marked drafts of the term sheet based on our meeting below. Per our discussion, the issue of dilution protection, in particular with respect to future equity raises with low valuations, remains unresolved. I am also circulating the attached to my client simultaneously and, as such, it remains subject to his further review and comment." Both by reference to the subject matter discussed and to Mr. Barkerding as their client, this exchange makes clear that Mr. Bishop understands, and has represented to both the lawyer and the principal for the NOLAAN group, that Stone Pigman represents Mr. Barkerding on his personal interests in the transaction. Notably, Mr. Barkerding was not included on this email, further underscoring the fact that Mr. Bishop had the authority to send negotiation documents on his behalf. Instead, Mr. Bishop forwarded the exchange to Mr. Barkerding right afterward.
88. Therefore, at least as of December 19, 2014, the NOLAAN group was aware, through its lawyer Mr. Graffagnini and its principal Michael Eckert, that Stone Pigman was representing the interests of not just the company, SmartPak, LLC, but of its founder Pike Barkerding as well. In spite of being so notified, neither Mr. Graffagnini nor Mr. Eckert, nor anyone else from the NOLAAN group raised any objections or concerns regarding this highly irregular arrangement. Instead, NOLAAN persisted and benefitted from this arrangement.
We find, as the Cara Stone Defendants contend, that the Cara Stone Defendants had no duty to Mr. Barkerding. See Montalvo v. Sondes , 93-2813 (La. 5/23/94), 637 So.2d 127, 130 (observing that "Louisiana subscribes to the traditional, majority view that an attorney does not owe a legal duty to his client's adversary when acting in his client's behalf"). Mr. Graffagnini's duty was to his client, NOLAAN. The interests of NOLAAN and SmartPak in the transaction were adverse. The trial court thus erred in failing to sustain the Cara Stone Defendants' exception of no cause of action as to the Fraud Claims.
Turning to the Fraud Claims against the Stone Pigman Defendants, the trial court found that those claim had prescribed because Mr. Barkerding failed to allege them within one year of the date that he knew or should have known of the *1188 defendants' alleged misconduct. In analyzing whether a claim is prescribed, the proper place to start is the allegations of the petition. Wells Fargo Fin. Louisiana, Inc. v. Galloway , 17-0413, p. 10 (La. App. 4 Cir. 11/15/17), 231 So.3d 793, 801 (citing Lima v. Schmidt , 595 So.2d 624, 628 (La. 1992) ). "[T]he prescriptive period applicable to an action is determined by the character of the action disclosed in the pleadings." Born v. City of Slidell , 15-0136, p. 8 (La. 10/14/15), 180 So.3d 1227, 1232.
Mr. Barkerding's petition alleges that the Fraud Claims are "delictual causes of action" subject to a one-year prescriptive period.[21] Nonetheless, as the trial court noted, "the prescriptive period for the [F]raud [C]laim[s] may be suspended or interrupted via contra non valentum or the continuing tort theory." Anticipating a prescription defense, Mr. Barkerding alleges in his petition that the Fraud Claims are timely for the following reasons:
Mr. Barkerding's delictual causes of action against these defendants are timely with respect to all transactions occurring less than one year before the filing of the original petition on August 8, 2017, and are timely as to all prior transactions as well, under the doctrine of contra non valentem , since Mr. Whittaker continued to fraudulently and/or intentionally misrepresent the nature of his representation through at least November 23, 2016, which is less than one year before the original petition.
The doctrine of contra non valentum is "a means of suspending the running of prescription when the circumstances of a case fall within one of four categories." M.R. Pittman Grp., L.L.C. v. Plaquemines Par. Gov't , 15-0513, p. 9 (La. App. 4 Cir. 12/2/15), 182 So.3d 303, 309 (citing Frank L. Maraist and Thomas C. Galligan, LOUISIANA TORT LAW § 10-4(b), 222 (1996) ). As the Louisiana Supreme Court has observed, the doctrine is used to "soften the occasional harshness of prescriptive statutes," but its application is limited to "exceptional circumstances.' " Id. (quoting Carter v. Haygood , 04-0646, p. 11 (La. 1/19/05), 892 So.2d 1261, 1268 ; and Marin v. Exxon Mobil Corp ., 09-2368, 09-2371, p. 13 (La. 10/19/10), 48 So.3d 234, 245 ).[22]
Although the jurisprudence has recognized four contra non valentum categories, Mr. Barkerding fails to identify which one he relies upon. Instead, Mr. Barkerding argues that his Fraud Claims accrued when the deception perpetrated by the defendants was finally revealed. He contends, as he alleged in his petition, that the deception was still being perpetrated as recently as November 23, 2016, when Mr. Whittaker persisted in deceiving him by affirming, again, that his personal interests *1189 in the transactions had been vigorously and faithfully represented by Stone Pigman as his personal attorney. According to Mr. Barkerding, the deception was not revealed until after SmartPak hired Stone Pigman to file suit against him in February 2017-the SmartPak Case. Thereafter, Stone Pigman refused to withdraw in response to Mr. Barkerding's Motion to Disqualify. During subsequent discovery related to the Motion to Disqualify, Mr. Barkerding contends that the Stone Pigman Defendants took the position for the first time on June 8, 2017 that they had never been Mr. Barkerding's personal attorney.[23]
Mr. Barkerding's argument falls within only one of the four contra non valentum categories: "where the obligor himself has done some act effectually to prevent the obligee from availing himself of his cause of action." Scott v. Zaheri , 14-0726, p. 15 (La. App. 4 Cir. 12/3/14), 157 So.3d 779, 788.[24] As the Stone Pigman Defendants point out, the only evidence Mr. Barkerding cites in support of his contra non valentum argument is the November 23, 2016 telephone call from Mr. Whittaker, which Mr. Barkerding recorded. Mr. Barkerding's argument is that Mr. Whittaker's telephone call to him on November 23, 2016 was "a fraudulent attempt to conceal or mislead [Mr.] Barkerding ... to prevent him from learning of his cause of action." Rejecting this argument, the trial court, albeit in addressing a different issue, reasoned as follows:
[T]he phone call in November was not an attempt to conceal or mislead Mr. Barkerding. By the time of the phone call Mr. Barkerding was aware of Mr. Whittaker's conflict of interest. He retained an attorney who threatened litigation against Mr. Whittaker and the board and comminated [sic ] to have the Stone Pigman defendants removed because of what he believed and knew was a conflict of interest.
Mr. Whittaker's testimony, at the trial on the exceptions, supports the trial court's finding that the November 23, 2016 telephone call was not a new act of deception. The colloquy between Mr. Whittaker and his counsel on this issue was as follows:
Q. You heard the little blip from the recorded telephone call in November 2016 that Mr. Meade played.... [T]ell us what you meant and what you were trying to convey ... ?
A. Yes. Well, here in the context that we-I just told you we were discussing where I raised this reference to the initial Series A raise. Mr. Barkerding called that the bear trap. That was an insult to me as he has insulted me many times in the past with respect to these allegations. My response was this, that was your lawyer-it was your lawyer negotiating for you. I did not mean to imply that I was the lawyer for Pike [Barkerding] personally. It is not uncommon for pronouns such as you, your, ours, I to be used in connection with representation that [a] lawyer has for the company. I represent businesses all the time.
In those settings oftentimes the lawyer would say in the meeting with the *1190 CEO, I am your lawyer. That is not to mean I am the CEO's lawyer. I am the company's lawyer or the CEO and other people would say he is my lawyer meaning I am the company's lawyer. I did not mean to-that I was his personal lawyer back then.
Mr. Barkerding's reliance on the November 23, 2016 telephone call as support for invoking the contra non valentum doctrine is misplaced.[25]
Likewise, Mr. Barkerding's suggestion that prescription did not begin to run until the Stone Pigman Defendants, representing SmartPak, filed the SmartPak Case against him is unpersuasive. As noted elsewhere in this opinion, the trial court rejected as unreasonable Mr. Barkerding's argument that "he did not become aware that the Stone Pigman [D]efendants were not representing him until the temporary restraining order was filed against him in February of 2017."
Summarizing, the record reflects that Mr. Barkerding knew of the facts underlying the Fraud Claims more than one year before this suit was filed. "Clearly, prescription begins to run when a plaintiff has actual knowledge that a damaging act has occurred." Robert , 14-0822, p. 17, 164 So.3d at 934. Logic dictates that the contra non valentum doctrine is unavailable when, as here, the plaintiff has actual knowledge. Id. , 14-0822, pp. 17-18, 164 So.3d at 934. (observing that "the doctrine of contra non valentum prevents the running of prescription where the cause of action is not known or reasonably discernable by the plaintiff"). We, thus, affirm the trial court's judgment sustaining the Stone Pigman Defendants' exception of prescription and dismissing the Fraud Claims against them.
The LUTPA Claims
The third remaining cause of action is the LUTPA Claims, which Mr. Barkerding asserted against both groups of defendants.[26] In response, both groups of defendants filed various exceptions. The *1191 trial court found that, as to the allegations regarding the defendants' actions "after the Series A negotiations," Mr. Barkerding stated a cause of action against both groups of defendants under the LUTPA. As to the Stone Pigman Defendants, we find no error in the trial court's ruling that the petition states a LUPTA cause of action. As with the Fraud Claims, however, we find the trial court erred in failing to sustain the Cara Stone Defendants' exception of no cause of action as to the LUTPA claims. Again, the Cara Stone Defendants duty was only to their client, NOLAAN.
Turning to the Stone Pigman Defendants, the trial court, citing Canal Marine Supply, Inc. v. Outboard Marine Corporation of Waukegan, Ill. , 522 So.2d 1201, 1203 (La. App. 4th Cir. 1988), observed that LUTPA Claims are subject to a one-year peremptive period and found that Mr. Barkerding did not bring the LUTPA Claims within the one-year peremptive period.
In addressing this claim, we acknowledge the uncertainty in the jurisprudence as to whether the LUTPA limitations period is peremptive-as opposed to prescriptive-and whether the limitations period is subject to suspension under theories such as continuing tort and contra non valentum .[27] In an apparent attempt to resolve this issue, the Louisiana Legislature *1192 amended La. R.S. 51:1409(E), effective August 1, 2018, to provide that "[t]he action provided by this Section shall be subject to a liberative prescription of one year running from the time of the transaction or act which gave rise to this right of action." (Emphasis supplied).[28]
Here, however, we find it unnecessary to address either the state of uncertainty in the jurisprudence or the impact, if any, of the statutory amendment. Instead, for the reasons discussed above in addressing the Fraud Claims and for the reasons set forth below by the trial court, we find the LUTPA claims are prescribed:
Even assuming that continuing tort[29] or contra non valentum applied here, Mr. Barkerding's claims are untimely for a number of reasons[, which are as follows:].
[1] Mr. Barkerding had actual notice of Mr. Whittaker's conflict as of January 9th, 2015, when he signed the engagement letter containing the disclosure.
[2] He was patently aware of his issues with the other board members (and of [Mr.] Whittaker's representation of Smart[P]ak in those conflicts) as evidence[d] by the communications between the parties throughout 2015.
[3] Finally, his ascertainable loss-that is, the dilution of his shares-occurred when the revised operating agreement was signed on January 21, 2015.
This Court does not agree with [Mr.] Barkerding's argument that the November 23, 2016 phone call between [Mr.] Barkerding and [Mr.] Whittaker constituted a new act of deception. The context of Mr. Whittaker's statement indicates ... he is informally using "your attorney" to mean SmartPak's attorney, which would not be a false statement.
Hence, we find that the trial court did not err in granting the Stone Pigman Defendants' peremptory exceptions of prescription as to the LUTPA Claims and dismissing those claims.[30]
The Conspiracy Claims
Mr. Barkerding's fourth, and final, cause of action is the Conspiracy Claims, *1193 which he asserted against both groups of defendants. The trial court sustained both group of defendants' peremptory exceptions of no cause of action as to the Conspiracy Claims. Citing Prime Insurance Company v. Imperial Fire and Casualty Insurance Company, 14-0323, pp. 9-10 (La. App. 4 Cir. 10/1/14), 151 So.3d 670, 676-77, the trial court reasoned that "[c]onspiracy itself is not an actionable claim under Louisiana law" and that "[t]he actionable element of a conspiracy claim is the underlying tort that the co-conspirators agree to perpetrate." Applying these principles, the trial court concluded that "[b]ecause Mr. Barkerding's other claims have prescribed, he no longer has a cause of action for conspiracy."
Because we affirm the trial court's dismissal of all of Mr. Barkerding's other claims against both groups of defendants on peremptory exceptions of no right of action, no cause of action, and prescription, we likewise affirm the trial court's finding that Mr. Barkerding fails to state a cause of action for conspiracy. Accordingly, we find that the trial court did not err in granting the defendants' peremptory exceptions of no cause of action as to the Conspiracy Claims and dismissing those claims.
DECREE
For the foregoing reasons, the judgments of the trial court are affirmed.
AFFIRMED

Although three amended petitions were filed, Mr. Barkerding averred in his Third Amended and Restated Petition that "[t]his petition replaces all prior versions of the petition." For ease of discussion, we refer in this opinion to the Third Amended and Restated Petition as "The Petition." None of the defendants filed an answer before Mr. Barkerding filed the Third Amended and Restated Petition; thus, the amending petitions were filed without leave of court.

As explained elsewhere in this opinion, Mr. Barkerding's petition lumps these two claims together in his petition under one heading as a single cause of action.

"An action may be barred by either prescription or peremption, or both. Liberative prescription is 'a mode of barring of actions as a result of inaction for a period of time.' " Max Tobias, Jr., John M. Landis, and Gerald E. Meunier, LA. PRAC. CIV. PRETRIAL § 6:12 (2017-18 ed.) (quoting La. C.C. art. 3447 ). An exception of peremption, like an exception of prescription, is raised by a peremptory exception. La. C.C.P. art. 927(A)(2). As the Stone Pigman Defendants point out, "[t]he trial court interchangeably uses the terms 'prescription' and 'peremption' [in its reasons for judgment] and that "the word choice is a distinction without a difference in this case." For ease of discussion, we refer to the exceptions raised by the defendants simply as exceptions of prescription.

On January 23, 2018, the trial court rendered judgment sustaining the Stone Pigman Defendants' peremptory exceptions of prescription, dismissing the Malpractice Claims, the Fraud Claims, and the LUTPA Claims; and sustaining the Stone Pigman Defendants' peremptory exception of no cause of action, dismissing the Conspiracy Claims. The Stone Pigman Defendants filed a Motion for New Trial seeking, in part, to add additional decretal language to ensure that this court was presented with a final judgment dismissing all of the claims against the Stone Pigman Defendants for purposes of appeal. On February 21, 2018, the trial court rendered a judgment on the motion, which provided that "IT IS ORDERED, ADJUDGED and DECREED that each and every one of Thomas Pike Barkerding's counts and claims against Scott Whittaker, William Bishop, and Stone Pigman Walther Wittmann, LLC is DISMISSED WITH PREJUDICE and that a final judgment is hereby entered in their favor and against [Mr.] Barkerding."

The trial court dismissed the claims against the Cara Stone Defendants in two separate judgments. On February 21, 2018, the trial court dismissed the Conspiracy Claims against the Cara Stone Defendants on an exception of no cause of action. On March 28, 2019, the trial court dismissed the remainder of Mr. Barkerding's claims against the Cara Stone Defendants-the Fraud Claims and the LUTPA Claims-on an exception of prescription. The March 28, 2018 judgment stated that "this Judgment is final under La. C.C.P. art. 1915 regarding all claims adjudicated herein, as there is no just reason for delay in rendering such final judgment."

A "koozie" is defined as "a fabric or foam sleeve that is designed to thermally insulate a beverage container, like a can or bottle." Wikipedia, THE FREE ENCYCLOPEDIA, Https://en.wikipedia.org/w/index.php?title=Koozie&oldid=865816850 (last visited Nov. 30, 2018).

SmartPak's initial members (and their ownership percentages) were as follows: Mr. Barkerding (51.6%); Mr. Post (16%); Goss Ventures LLC (8%); Jorge Nagel (2.4%); and Carrere Consulting LLC (2%).

NOLAAN is an investment group that provides "angel funding" to local start-up companies. "Angel funding," according to Mr. Barkerding's petition, is defined as funding "typically understood to come after 'seed' investing by friends and family members of founders, and prior to 'venture capital' investing by larger, more organized investment companies." NOLAAN acts as an "umbrella entity" through which its members review and potentially provide funding to start-up companies.

According to the Petition, Mr. Graffagnini was "the founder and managing partner of defendant Graffagnini & Associates, LLC and of defendant Cara Stone, LLP." Mr. Barkerding avers that "[a]t the time of the acts complained of herein, Mr. Graffagnini was the principal in charge of, and acting in his capacity as Graffagnini, A Law Corporation, which is the predecessor in interest to, and now a partner of, Cara Stone, LLC."

Additional financing rounds were closed in May 2016 (the Class A Extension Unit Purchase Agreement) and February 2017 (the Class AA Unit Purchase Agreement), pursuant to which SmartPak sold additional equity to NOLAAN's members.

As discussed elsewhere in this opinion, these contracts formed the basis of a separate suit by SmartPak against Mr. Barkerding, which was filed in February 2017.

As discussed in detail elsewhere in this opinion, the trial court denied, in part, the Stone Pigman Defendants' exception of no right of action. The trial court also denied the Stone Pigman Defendants exception of no cause of action as to all the claims except the Conspiracy Claims.

The trial court denied the Cara Stone Defendants' exception of no cause of action as to all the claims except the Conspiracy Claims.

Mr. Barkerding counters that the trial court's partial denial of the Stone Pigman Defendants' exception of no right of action is an interlocutory judgment not properly before this court on appeal. Instead, Mr. Barkerding contends that this ruling could only be reviewed on supervisory writ. This argument is unpersuasive. The trial court's ruling, as the Stone Pigman Defendants point out, was part of its final judgment dismissing the Stone Pigman Defendants. The entire judgment is properly before us on appeal. See Favrot v. Favrot , 10-0986, p. 2, n. 1 (La. App. 4 Cir. 2/9/11), 68 So.3d 1099, 1102 (observing that "[a]lthough an interlocutory judgment may not be immediately appealable, it is nevertheless subject to review by an appellate court when a judgment is rendered in the case which is appealable") (citing People of Living God v. Chantilly Corp ., 251 La. 943, 207 So.2d 752, 753 (1968) ); see also Roger A. Stetter, LOUISIANA CIVIL APPELLATE PROCEDURE, § 3:35 (Sept. 2018 Update) (observing that "[i]n most instances, when an unrestricted appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory judgments prejudicial to her, in addition to the review of the final judgment"). We note this applies equally to the Cara Stone Defendants' right to raise on appeal their exception of no cause of action as to the Fraud Claims and the LUTPA Claims, which is discussed elsewhere in this opinion.

The Stone Pigman Defendants emphasize that the appellate court in International Strategies , albeit applying Massachusetts law, cites one of the same cases the Louisiana Supreme Court cited in Austin, supra -the Sheinkopf case. The court, in Sheinkopf , held that no implied attorney-client relationship was created between an attorney and an investor when the investor bought into a joint venture managed by the attorney. As the appellate court in International Strategies observed, this result was reached despite that "the attorney prepared various legal documents for the investor's signature and requested that he sign them; promised to 'protect' the investor; told the investor that 'other clients of [the firm]' were also investing in the venture; listed the firm's address on the joint venture's legal documents; and transacted joint venture business out of his law firm office and with the assistance of his law firm secretary." 482 F.3d at 9. The court in Sheinkopf found "particularly persuasive that the investor 'never explicitly requested [the attorney] or [the law firm] to represent him, never sought any legal advice from them, and was never billed for services.' " Id . (quoting Sheinkopf , 927 F.2d at 1268 ).

Summarizing the Stone Pigman Defendants' arguments, the trial court stated the following in its reasons for judgment:
The Stone Pigman [D]efendants note that Mr. Barkerding was well-versed in forming companies, and was aware of the difference between personal and entity representation. For example, Mr. Barkerding founded an online clothing company called Upperline Clothiers, was marketed as a clothing line using innovative fabric designs. He created another company called Bideo, in which video content could be bought and sold online. Mr. Barkerding hired a tax attorney for at least one of his companies; he also sought investors and drafted corporate documents for these previous companies. In addition, the Stone Pigman [D]efendants argue that Mr. Barkerding engaged Carver Darden during SmartPak's early stages to serve as his personal attorney for patent protection of [the Invention]. Mr. Barkerding was advised by Carver Darden in an extensive email that, in order to shift its representation from himself to SmartPak, a number of involved legal steps were required (including conflict waivers).

The trial court, in its reasons for judgment, further notes:
The Stone Pigman [D]efendants stated that they met a number of times with the owners of SmartPak, and advised the group that they were negotiating with the Series A investors on behalf of SmartPak. The Stone Pigman [D]efendants point out that they would not have been negotiating on behalf of one member, since the operating agreement required unanimous consent of all SmartPak's members in order to admit new members.
In an email dated December 21, 2014, attorneys from Stone Pigman wrote to Mr. Barkerding about sending the term sheet and cap table to the other common members, so that they, "as the company's lawyers," could explain it to the group. Stone Pigman also points to a January 3, 2015 email sent to Mr. Barkerding about his desire to sell some of his shares to a third party in which they advised Mr. Barkerding that they would not be representing him in that transaction.

The trial court further noted that Mr. Barkerding testified he did not know if the Carver Darden attorneys were working for him or for SmartPak, although he believed that Carver Darden was representing SmartPak and not himself individually. The trial court, however, noted that the bills were addressed to Mr. Barkerding. The trial court still further noted that "Mr. Schwartz testified that he did not recall Mr. Barkerding ever expressing a concern about being personally represented during the Series A negotiations."

See also Desire Narcotics Rehab. Ctr., Inc. v. White , 97-2758, 98-0925, p. 5 (La. App. 4 Cir. 4/14/99), 732 So.2d 144, 146-47 (observing that "when an attorney is retained to represent a corporation, the attorney owes his duty (and loyalty) to that corporation and the attorney must, within the bounds of law, pursue the best interests of the corporation in accordance with the lawful instructions of the corporation's management").

Because we find this argument has merit, we pretermit addressing the issue of whether a partial exception of no right of action is procedurally proper. See Johno v. Doe , 15-0737, p. 9, n. 7 (La. App. 4 Cir. 3/9/16), 187 So.3d 581, 592 (Tobias, J., dissenting) (suggesting that a partial exception of no right of action is procedurally improper and that "[t]he proper procedural vehicle to address an issue that might sound as if it would be a partial exception of no right of action is a motion for summary judgment"); State, by & through Caldwell v. Astra Zeneca AB , 16-1073, p. 6 (La. App. 1 Cir. 4/11/18), 249 So.3d 38, 43, writs denied , 18-0766, 18-0758 (La. 9/21/18), 252 So.3d 899, 904 (observing that "if a plaintiff has a right of action as to any one of the theories or demands for relief set out in his petition, the objection of no right of action should be overruled"); Talbot v. C. & C. Millworks, Inc ., 97-1489 (La. App. 1 Cir. 6/29/98), 715 So.2d 153 (holding it was procedurally improper for the trial court to sustain a partial exception of no right of action since both actions arose from a single set of facts); but see Frank L. Maraist, 1 LA. CIV. L. TREATISE, CIVIL PROCEDURE § 6:7 (2d. ed.) (observing that :[i]n 1997, the Legislature authorized a partial final judgment which 'sustains an exception in part' ").

See La. C.C. art. 3492 (providing that "[d]elictual actions are subject to a liberative prescriptive period of one year. This prescription commences to run from the day injury or damage is sustained").

The continuing tort theory is analogous to the contra non valentum doctrine. See Zeigler v. Hous. Auth. of New Orleans, 12-1168, p. 12 (La. App. 4 Cir. 4/24/13, 118 So.3d 442, 452 (observing that "[t]he continuing tort doctrine is a suspension principle based on contra non valentum "). The continuing tort doctrine only applies when continuous conduct causes continuing damages. Lopez v. House of Faith Non-Denomination Ministries , 09-1147, p. 3 (La. App. 4 Cir. 1/13/10), 29 So.3d 680, 682 (citing Bustamento v. Tucker , 607 So.2d 532, 542 (La. 1992) ). When the cause of injury is a continuous one that gives rise to successive damage, prescription does not commence running until the conduct causing the damage is abated. Lopez , pp. 3-4, 29 So.3d at 682. The continuing tort doctrine has its roots in property damage cases and requires that the operating cause of the injury be a continuous one that results in continuous damages. Crump v. Sabine River Auth. , 98-2326, p. 7 (La. 6/29/99), 737 So.2d 720, 726.

Mr. Barkerding makes the same argument as to his LUTPA Claims.

The other three categories of contra non valentem are: 1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; 2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; and 3) where the cause of action is not known or reasonably knowable by the plaintiff, even though this ignorance is not induced by the defendant. Zaheri , 14-0726, p. 16, n. 10 (La. App. 4 Cir. 12/3/14), 157 So.3d 779, 789.

The Massachusetts court in Clemente v. Martinelli , 92 Mass.App.Ct. 1126, 102 N.E.3d 1030, n. 5 (2018) (unpub .), rejected a similar argument that the use of the pronoun "you" in a letter established an attorney-client relationship; the Massachusetts court reasoned as follows:
The plaintiff relies on another part of Martinelli's letter, where he states, "I propose to help solve the remainder of this problem by assisting you as counsel in the capital-raising process" (emphasis added). From the context of the entire letter, however, it is apparent that Martinelli is referring to assisting CC [the company client], not the plaintiff personally. In the very next sentence, Martinelli states that he "would not expect to be paid until CC raised additional cash." In addition, the following paragraph states that in consideration of his extending credit for legal services performed, CC should grant him the option of buying additional units in CC. Since Martinelli had always billed CC for his services, it is clear that he was stating his willingness to continue working for CC on credit until its cash-flow issues were resolved. Finally, in the letter Martinelli expressly states ... that he has been working solely for CC.

The pertinent allegations of the Petition regarding the LUPTA Claims are as follows:
141. As recently as November 23, 2016, Scott Whittaker, on behalf of NOLAAN, Dann Schwartz, and Michael Eckert, was continuing to contact Mr. Barkerding to provide him legal advice and recommendations that were adverse to his interests. Mr. Whittaker did so, in spite of the fact that Mr. Barkerding was either (a) an unrepresented party, in which case the communications violated Rule 4.3 of the Louisiana Rules of Professional Conduct, or (b) was a represented party, in which case the communications violated Rule 4.2 of the same.
142. Mr. Whittaker used his position of trust cultivated over the years to convince Mr. Barkerding to acquiesce to the unwarranted demands of NOLAAN and Mr. Whittaker's fellow board members there, Dann Schwartz and Michael Eckert. As a result, Mr. Barkerding was further harmed through additional dilution of his ownership in SmartPak, through the Series AA financing round that closed in February, 2017.
143. Meanwhile, Dann Schwartz, Michael Eckert, NOLAAN and Scott Whittaker prepared a litigation and intimidation strategy designed to overwhelm Mr. Barkerding, beginning with the ex parte temporary restraining order that it procured against him.
144. Mr. Whittaker was acting in his capacity both as a partner at Stone Pigman and as a member of the NOLAAN Board of Directors....
145. In addition, defendants Graffagnini, Graffagnini Law Corporation, and Cara Stone LLP, are liable to plaintiff because they were aware of and actively participated in and facilitated the tainted transactions, as outlined above. Specifically, Mr. Graffagnini participated in one-on-one negotiations with Stone Pigman, regarding Mr. Barkerding's personal interests in the contemplated transactions. Mr. Graffagnini did so with the knowledge that Stone Pigman had fraudulently misrepresented itself to Mr. Barkerding, having induced Mr. Barkerding to believe that his personal interests were being advocated and protected by Stone Pigman.
146. Mr. Graffagnini was acting in his capacity as a lawyer in the Graffagnini Law Corporation and its successor Cara Stone LLP, and as the lawyer for and agent of the NOLAAN group of investors, including his fellow NOLAAN board members Mr. Eckert and Mr. Schwartz. Therefore Mr. Graffagnini is liable to Mr. Barkerding is his own right; Graffagnini Law Corporation is liable to Mr. Barkerding in its own right and also under the doctrine of respondeat superior, and Cara Stone LLP is liable to Mr. Barkerding as the successor in interest to Mr. Graffagnini and the Graffagnini Law Corporation.

See Justin M. Woodard, "Unnecessary to Address"?: Tackling the Louisiana Supreme Court's Open Question of Whether A Continuing Tort Can Suspend the Louisiana Unfair Trade Practices Act's One-Year Peremptive Period , 85 Tul. L. Rev. 865, 884 (2011) (observing that "in Miller v. ConAgra , [Inc ., 08-0021 (La. 9/8/08), 991 So.2d 445,] not only did the court fail to address the more difficult question of whether a continuing tort can suspend a one-year peremptive period, it also turned back the clock several decades when it neglected well-settled Louisiana state court jurisprudence holding that LUTPA's one-year period is preemptive" and suggesting that a continuing tort should not, in fact, suspend this statutory peremptive period); Zeigler v. Hous. Auth. of New Orleans , 12-1168, p. 12 (La. App. 4 Cir. 4/24/13), 118 So.3d 442, 451-52 (observing that "[n]othing can interfere with the running of a peremptive period").

Before the amendment, La. R.S. 51:1409(E) provided that actions brought under LUTPA "shall be prescribed by one year running from the time of the transaction or act which gave rise to this right of action." La. R.S. 51:1409(E).

The trial court, in its reasons for judgment, observed that two other circuits-the First and the Third-have extended the limitations period for LUTPA claims based on the continuing tort doctrine in situations involving "an active, statutory duty that was continually violated." Here, however, the trial court found that was not the case; rather, the trial court found that "[a]lthough [Mr.] Whittaker had a statutory/ethical duty to disclose the potential conflict to [Mr.] Barkerding, he made that disclosure in his engagement letter on January 8, 2015." (Mr. Whittaker emailed the engagement letter on January 8, 2015; Mr. Barkerding, as CEO of SmartPak, signed and returned the letter on the next day, January 9, 2018.) The trial court thus found the continuing tort doctrine inapposite here. We agree.

In their answer to the appeal, the Cara Stone Defendants contend that the LUTPA Claims alleged in the petition are based solely on the defendants' actions in their role as attorneys and that the trial court thus erred in failing to sustain their peremptory exception of no cause of action to the LUTPA Claims. See Quality Envtl. Processes, Inc. v. I.P. Petroleum Co., Inc ., 13-1582, 13-1588, 13-1703, p. 23 (La. 5/7/14), 144 So.3d 1011, 1026 (citing Thibaut, Thibaut, Garrett and Bacot v. Smith and Loveless, Inc ., 576 So.2d 532, 537 (La. App. 1st Cir.1990) for the proposition that "LUTPA is an act of the legislature and cannot be applied to regulate or define the practice of law, including the conduct of attorneys"). The Stone Pigman Defendants made the same argument in the trial court. Given our affirmance of the trial court's judgment dismissing the LUTPA Claims for other reasons, we do not reach this issue.